Gerald A. Marks (*Pro Hac Vice* Forthcoming)
    Email: jerry@marksklein.com
Louis D. Tambaro (*Pro Hac Vice* Forthcoming)
    Email: louis@marksklein.com
Evan M. Goldman (*Pro Hac Vice* Forthcoming)
    Email: evan@marksklein.com
MARKS & KLEIN, LLP
63 Riverside Avenue
Red Bank, New Jersey 07701
Phone: 732-747-7100
Fax: 732-219-0625

Eric J. Schindler (CA Bar No. 141386)
    Email: eric@schindlerlaw.net
SCHINDLER LAW GROUP
20321 SW Birch Street, Suite 200
Newport Beach, California 92660
Phone: 949-483-8700
Fax: 949-464-9714

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

| | |
|---|---|
| FOAGLA, INC., a California corporation, on behalf of itself and the Bakersfield FOA, the Central California FOA, Inc., the Central Valley FOA, the Greater Bay FOA, the Joe Saraceno FOA, the Northern California FOA, the San Diego FOA, the Sacramento Valley FOA, the Sierra FOA, Cal-Neva FOA, Inc., and the San Francisco-Monterrey Bay FOA; and Jas Dhillon, an individual; Gurtar Sandhu, an individual; Serge Haitayan, an individual; Ray Dhaliwal, an individual; Tarlochan Rangi, an individual; and John Does 1-1000 who are similarly situated California individual 7-Eleven franchise owners, | Case No.: |
| | VERIFIED COMPLAINT FOR: |
| | 1. Racial Discrimination in Violation of 42 U.S.C. §1981 and California Civil Code § 51, *et seq.* |
| | 2. Invasion of Privacy and Illegal Surveillance |
| | 3. Retaliation Against Franchisees in Violation of California Franchise Relations Act § 20021 |
| | 4. Misclassification of Employment Relationship with Franchisees |
| Plaintiffs, | |
| v. | DEMAND FOR JURY TRIAL |
| 7-ELEVEN, INC., a Texas corporation, | |
| Defendant. | |

1

## THE PARTIES

1.    Plaintiff FOAGLA, Inc. ("FOAGLA") is a California corporation with a principal place of business in Chino Hills, San Bernardino County, California. FOAGLA is an association of franchisees organized through a Franchise Owners' Association.   FOAGLA was established as an organization for the purpose of addressing franchisee members' collective business concerns in an organized fashion for the benefit of its members and the general good of the franchise brand.

2.    Plaintiffs Jas Dhillon, Gurtar Sandhu, Serge Haitayan, Ray Dhaliwal and Tarlochan Rangi are all current California 7-Eleven franchisees and/or members of FOAGLA, and residents of California.

3.    Defendant 7-Eleven is a Texas corporation with a principal place of business in Dallas, Texas. 7-Eleven regularly does business in the State of California and sufficient to establish personal jurisdiction over this entity.

## VENUE AND JURISDICTION

4.    This is a case of actual controversy, which the Plaintiffs and 7-Eleven have not been able to resolve.

5.    Plaintiffs seek a declaration of their rights following 7-Eleven's violations of multiple state and federal laws.

6.    Plaintiffs seek declaratory judgment, under 28 U.S.C. § 2201(a).

7.    The amount in controversy in this action exceeds the jurisdictional requirement established under 28 U.S.C. § 1332(a), and the parties are completely diverse.

8.    7-Eleven is subject to the jurisdiction of this Court by the terms of the forum selection clauses appearing in its underlying Franchise Agreements.

9.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this district.

## ASSOCIATIONAL STANDING

10.      FOAGLA has standing to maintain this action. At least one of its members (indeed, all of its members) will suffer injury in fact by the real and immediate threatened harm from 7-Eleven's conduct.

11.      Further, the interests sought to be protected by this action are germane to the FOAGLA's organizational purpose, which is the protection of members' franchisee rights, establishing a dialogue between franchisee members and 7-Eleven, an efficient means to identify and address franchisee business issues and concerns and the promotion of the 7-Eleven brand for the good of all parties.

12.      The interests sought to be protected by FOAGLA are the rights its members (who are all 7-Eleven franchisees) to prevent 7-Eleven from abusing their rights through its abuse of both federal law and the laws of the State of California.

13.      Finally, neither the claims asserted nor the relief requested requires the participation of individual members of FOAGLA (i.e. the 7-Eleven franchisees) since FOAGLA can prove its allegations of 7-Eleven's breach of the multiple state and federal laws, and other franchisee abuses, through 7-Eleven's own internal documents and data, statistical analysis pertaining to franchisee termination and investigations, and through expert reports and testimony.

14.      The claims for relief involves issues and 7-Eleven's policies and protocol that are common to all members of FOAGLA and do not require determination on an individual basis.  The claim is for declaratory relief only and does not involve any potentially differing claims for monetary compensation.

15.      Thus, FOAGLA has the requisite standing to seek the requested non-monetary relief on behalf of its members.

## BACKGROUND

16.      7-Eleven was once a powerful symbol of the American Dream, a striking example of how American innovation combined with the dreams,

ambitions and work ethic of recent immigrants could, through franchising, simultaneously create a shared prosperity for both a large corporate entity and thousands of small business owners and their families.

17.     Tragically, 7-Eleven has now become a cautionary tale of the dangers of corporate greed in the franchise context.  7-Eleven has become an unfortunate example of the tragic results that occur when a franchisor ceases to consider its franchisees as valuable, independent contractors and business owners, and to see them merely as disposable assets to be exploited for short-term profits, then discarded once their value has been extracted.  Once a validation of the uniquely American franchise model, 7-Eleven is now a modern validation of historian John Dalberg-Acton's warning that *power corrupts and absolute power corrupts absolutely*.

18.     Through the 20th century, 7-Eleven pioneered and grew the "convenience store" concept and helped make it a standard part of American life. What fueled 7-Eleven's growth was its franchise arrangement with small business owners, many of them South Asian immigrants from such countries as India and Pakistan, who paid upfront franchise fees and operated the 7-Eleven franchised stores in exchange for a percentage of the store profits.

19.     7-Eleven found that the South Indian cultural traits of hard work, family unity, respect for authority, and community-mindedness made South Asians ideal owner/operators for 7-Eleven stores.

20.     The same franchisee cultural attributes that were highly prized by 7-Eleven management would later be regarded as weaknesses to be exploited for profit by the current management.

21.     In 2005, the 7-Eleven chain was fully acquired by Tokyo-based Seven and I Holdings Co., one of the largest retail conglomerations in the world, and was taken private.  Seven and I Holdings Co. staffed many of the top management

positions of the company with West Point graduates, including its CEO, Joseph DePinto, with a cold, predatory and militaristic approach to business.

22.     The new regime looked at its relationship with their franchisees and saw an opportunity to exploit the trust and to transform the goodwill the franchisees had built in their local markets into corporate profit. 7-Eleven realized that it could reap almost unlimited revenue by expelling certain franchisees, paying them nothing, and selling their franchises (and associated goodwill) for an enormous profit.  In fact, they realized that they could increase their profits exponentially by reselling valuable stores over and over – an industry practice known as "churning."

23.     In order to effectively harvest the maximum profit at the expense of their franchisees, 7-Eleven secretly transformed its relationship with its franchisees from one of benign cooperation to one of coldhearted predation.

24.     7-Eleven quietly but aggressively diminished the role of the franchisee from independent contractor and respected business owner to one of a low-level employee with little-to-no decision-making power.

25.     7-Eleven knowingly violated its franchisees' rights to privacy with a surveillance program arguably more sophisticated and invasive than ever deployed in the franchise industry.

26.     7-Eleven implemented tactics designed to exploit South Indian cultural and societal traits – such as respect for authority and fear of being shamed in their communities – to its full advantage.

27.     7-Eleven readily deployed any means necessary to brutally discredit and crush any franchisee advocate who voiced opposition or dared to stand up to its predatory practices.

28.     In one of the most tragic business stories in recent years, a foreign corporation has been allowed to transform the *American Dream* into an *American Nightmare* for countless individuals and families.

## SUMMARY OF THE ACTION

29.     This is an action brought on behalf of FOAGLA and other California franchise associations comprised of more than one thousand, two hundred (1200) 7-Eleven franchisees in the State of California against Defendant 7-Eleven, Inc. ("7-Eleven").  It is also brought on behalf of the named individual Plaintiffs and those similarly situated.

30.     FOAGLA complains and seeks declaratory relief for the following wrongful conduct by 7-Eleven in the operation of its franchise:

        a.     Engaging in an ongoing and illegal pattern of racial discrimination and intimidation against South Asian 7-Eleven members of FOAGLA and other franchisees throughout its franchise system, in violation of both Section 1981 of the US Civil Rights Act and the Unruh Civil Rights Act (California Civil Code Section 51 *et seq.*). For the past several years, 7-Eleven has embarked upon a corporate policy to terminate long term successful franchisees who are, in the main, South Asian immigrant American store operators[1] despite the fact that it was this very group of hard-working and loyal franchisees who historically helped build the 7-Eleven system to what it is today namely, 8,300 locations throughout the United States. Rather than rewarding its South Asian franchisees for their efforts, 7-Eleven has, instead, organized an aggressive and discriminatory campaign of harassing, intimidating, profiling and accusing these same loyal franchisees with unfounded false threats of wrongdoing as part of a larger corporate effort to terminate their successful franchise stores and take the stores back at no cost. 7-Eleven then "churns" or re-sells the stores, realizing a windfall profit to new franchisees. Upon information and belief, the above pattern of wrongdoing is designed to establish better corporate earnings for the purpose of taking 7-Eleven "public" but has a discriminatory effect upon South Asian franchisees.

---

[1] "South Asian" is to be defined herein as emanating from India, Pakistan, Nepal, Sri Lanka, Bangladesh, Bhutan and the Maldives.

b.      Engaging in illegal and "Orwellian" surveillance of FOAGLA franchisee member operations with audio-visual equipment that was originally utilized to protect franchisees from third party crime and theft but is now, instead, being used to spy on franchisees in violation of California's statutory privacy laws. In addition, 7-Eleven has deployed unlicensed private investigators to follow franchisee activities outside of the store in violation of California statutory anti-stalking laws.

c.      Changing the independent contractor status of its franchisees to that of employees who have no say in the operations of their stores. As outlined in following portions of this Complaint, 7-Eleven has imposed such a strict system of controls that extend far beyond those controls that are generally accepted in a franchise relationship including weekly, if not daily, email operational directives issued by multiple levels of 7-Eleven corporate management (Field Consultant, Market Manager and Zone Leader).

d.      Targeting 7-Eleven franchisee advocates in violation of both FTC regulation and California franchise law in order to eliminate "problem" franchisees who seek to advance franchisee rights and are involved in organized franchise associations including but not limited to FOAGLA.

**Declaratory Relief Sought**

31.     Plaintiffs now bring this action on behalf of its members for purely equitable relief by way of Declaratory Judgment to declare illegal and improper Defendant 7-Eleven's actions with respect to Plaintiffs, all California franchisees and all franchisees in the system for:

a.      Violating the United States Civil Rights Act, 42 U.S.C. § 1981 by purposefully targeting, harassing and discriminating against franchisee members of FOAGLA of South Asian descent and all other franchisees similarly situated in the 7-Eleven Franchise System;

b.    Violating § 20021 of the California Franchise Relations Act through the improper termination of franchises and its improper "churning" scheme aimed at successful, outspoken South Asian franchisees.

c.    Invading the privacy and seclusion of FOAGLA members and franchisees throughout its entire system through the use of intrusive and illegal electronic video surveillance systems in violation of and California Civil Code § 1708.8 and the anti-"stalking" provisions of California Penal Code § 646.9;

d.    Improperly classifying members of FOAGLA and franchisees throughout the entire 7-Eleven system are classified as independent contractors when they are, in fact, employees of 7-Eleven.

**FOAGLA Franchise Association**

32.    FOAGLA was specifically formed by its franchisee members for the purpose of representing their collective business needs and addressing their business concerns to 7-Eleven in a productive and professional forum.

33.    FOAGLA meets regularly and in an organized fashion, for the benefit of its members and the 7-Eleven system, to discuss franchisee issues, which issues have recently become overwhelming, due to 7-Eleven's increasingly litigious and hyper-aggressive tactics to monitor, and in some cases to target and terminate, their franchisees.

34.    As franchisee efforts to address these issues in a business context have fallen flat and have only been met with increased aggression, FOAGLA is left with no choice but to bring this Declaratory Judgment action.

## **BACKGROUND FACTS**

A.    **7-Eleven's Violations of FOAGLA Members and Franchisees' Civil Rights**

35.    Within the past several years, 7-Eleven has aggressively sought to terminate successful franchisees upon bogus grounds of wrongdoing for the business

purpose of "churning" the stores to obtain "windfall" profits by taking back the stores at no cost and reselling them to new franchisees.

36.     Although there have been suspicions of an improper overall termination scheme by Defendant 7-Eleven, direct evidence of that came to light during the early Spring of 2014, when "whistleblower" Kurt McCord, a former 7-Eleven supervisor of corporate investigations disclosed same and made a Certification in 7-Eleven v. Sodhi, a New Jersey District Court case bearing Civil Action No.: 13-cv-03715. Attached hereto and incorporated herein as Exhibit A is a true and correct copy of the Certification of Kurt McCord ("McCord Cert."), ¶¶ 4 – 8.

37.     Upon further information and belief, 7-Eleven's intimidation and termination efforts are primarily focused on the states of New York, New Jersey and California. See Exhibit A, McCord Cert., ¶ 43.

38.     To achieve their goal of improperly terminating franchisees, 7-Eleven uses coercive and unlawful interrogation techniques, and has resorted to stalking franchisees. See Exhibit A, McCord Cert., ¶ 100.

39.     The sole purpose of acquiring franchisees' stores – albeit through illegal means – is to "take back" the stores, at no cost, with the intent to ultimately re-sell the store, for a fee, to a third party purchaser. See Exhibit A, McCord Cert., ¶ 7.

40.     7-Eleven has hired more Asset Protection employees than any other company in 2013. See Exhibit A, McCord Cert., ¶ 32

41.     7-Eleven hired approximately thirty-five Asset Protection employees.

42.     7-Eleven uses its Asset Protection/Loss Prevention ("AP/LP") Department as a profit center to realize a significant return on its investment in hiring large numbers of Asset Protection employees. See Exhibit A, McCord Cert., ¶¶ 38 – 42.

43.     Tremendous pressure is exerted upon the asset protection investigator employees to provide a return on the AP/LP Department investment.

44.    Upon information and belief, 7-Eleven has instituted quotas to the AP/LP Department which, in turn, causes the AP/LP employees to bring dubious and fabricated charges – based on unlawful and intimidating searches of franchisees, such as Andy.

45.    Upon further information and belief, 7-Eleven's efforts are primarily focused on FOA, PAC and/or Community Leaders. See Exhibit A, McCord Cert., ¶ 46.

46.    Converse to 7-Eleven, most retailers use asset protection departments in a "non-productive" manner, trying to limit losses from theft and shrinkage.

47.    However, 7-Eleven uses its AP/LP Department as a "productive work center" by taking back franchises at no cost – only to resell them for a large fee.

48.    7-Eleven's efforts to terminate franchises and take back stores have been extremely profitable for 7-Eleven.

49.    Upon information and belief, the amount received by 7-Eleven in reselling taken-back stores is in excess of ten million dollars.

50.    FOAGLA and all 11 named FOA stores are all located in primary target areas for 7-Eleven's unlawful investigations.

51.    When Mark Stinde ("Stinde"), Vice President of Asset Protection for 7-Eleven, was given permission by 7-Eleven to hire the aforementioned AP/LP Department employees, the positions were not posted publicly and the vast majority of the investigators were given assignments in two newly created divisions: (i) the Centralized Investigations Team ("CIT"); and (ii) the Profit Assurance Team ("PAT"), a mobile surveillance team.

52.    Upon information and belief, 7-Eleven used its CIT and PAT teams to stalk FOAGLA members, specifically including Adnan Khan.

53.     The effect of 7-Eleven's "churning", termination and Asset Protection Department policies has been discrimination against franchisees of South Asian descent.

54.     7-Eleven and its agents have resorted to tactics against South Asian franchisees ranging from stalking, spying, bullying, and interrogation to coerce these franchisees into giving up their stores without compensation.

55.     7-Eleven has also targeted these franchisees because they have taken an active role in franchisee associations and been vocal advocates of franchisee rights and system change.

56.     7-Eleven's business actions have resulted in discrimination against South Asians and are based on deep-rooted sociological factors pertaining to South Asian culture.  See attached Exhibit B, Certification of Saint Louis University Professor of Marketing, Brett Boyle, Ph.D.

57.     As Professor Boyle has opined in paragraph 7 of his Certification: 7-Eleven has targeted primarily Indian and Southeast Asian ethnic groups for the purposes of exploiting cultural vulnerabilities associated with these groups on the basis of "power distance" and "collectivism". Power Distance means an acceptance of a subordinate role in a relationship with 7-Eleven. Collectivism means franchise ownership tends to be centered within families.

58.     As a result, individuals from such cultures will tend to acquiesce to coercion by the franchisor, given the disproportionate power advantage the franchisor holds. See Boyle Cert., paragraphs 17-24.

59.     Further, the threat of making public any claims of franchisee impropriety (however false) carries with it "a great deal of shame to the family within the tightly knit South Asian community, thereby making it even easier to coerce these franchisees.  See Boyle Cert., paragraphs 25-27.

60.   Further the attached Certification of Professor Jaideep Singh (Exhibit C) sets forth the numerous sociological reasons that South Asian franchisees are particularly vulnerable to 7-Eleven's "churning" tactics.

61.   Professor Singh finds that 7-Eleven's is "aware of and exploits the social vulnerability of South Asian American immigrants" in which "everyone knows everyone else, and often the intimate details of their personal business" and where threats by 7-Eleven investigators of incarceration and public censure leads to "community level shaming" which, in turn, will lead to "social exclusion" and "inflict a 'social death' upon shunned community members."  See Singh Cert., paragraphs 6, 9-10.

**B.    Retaliation against FOA Members with Threats of Default and Termination.**

62.   7-Eleven has also violated Section 20021 of the California Franchise Relations Act through its scheme of improperly churning successful franchisees and acquiring their stores without compensation, in violation of Section 20021.

63.   Upon information and belief, in addition to its discriminatory intent, 7-Eleven's motive behind the rash of termination and enforcement actions is to silence vocal, opinionated franchisees that may complicate its attempts to go public and/or to court private equity investors.

64.    More specifically, 7-Eleven has recently targeted FOAGLA and other Franchise Owners Association ("FOA") presidents and vocal association members throughout the United States.

65.   As set forth herein, 7-Eleven has brought numerous actions against FOA representatives in various States throughout the United States and has also targeted FOAGLA members for unsubstantiated alleged offenses.

**C.    Covert and Illegal Surveillance and Stalking of FOAGLA Members.**

66.     7-Eleven has also increasingly asserted extensive and oppressive mechanisms of control to direct, directly oversee, micromanage and even surreptitiously spy on franchisee operations, all of which render the parties' relationship clearly that of employer and employee.

67.     7-Eleven's control mechanisms, include, but are not limited to, unfettered and abused access to franchisees' by electronic surveillance DVR systems (the "System").

68.     7-Eleven is now seeking to impose an even more intrusive surveillance system upon FOAGLA members by attempting to coerce FOAGLA members to enter into an amendment to the underlying franchise agreement.

69.     The amendment to the Franchise Agreement is commonly referred to as the "Security System and Monitoring Amendment." See Security System and Monitoring Amendment attached hereto as Exhibit D.

70.     The Security System was initially installed by 7-Eleven for the stated purpose of protecting franchisees from theft and other unwanted intrusions. See Exhibit E, Certifications of former 7-Eleven Asset Protection Investigators, John Ragsdale and Kevin Eliason and Art Salcido, former LP and Market Manager of SEI.

71.     The stated purpose of the Security System and Monitoring Amendment drafted by 7-Eleven notably omits any implicit or explicit reference to surveillance of the franchisees' day-to-day operations.  Anything not covered within the stated purpose is protected by a reasonable expectation of privacy from recording.

72.     Further, the following portions of a 7-Eleven Asset Protection slide show explain the numerous camera angles, exception based reporting and synchronization with POS and other franchisee entries are used to collect information on franchisee activities, all of which belie 7-Eleven's designation of its franchisees as "independent contractors":













73.   Such surveillance measures, even if proper, are only permissible in employer-employee situations.

74.    Upon information and belief, these surveillance systems were installed to, and have been used extensively to, monitor franchisee operations in order to support untrue and manufactured claims of theft and other store mismanagement.

75.    While the systems are purportedly installed to "protect" franchisees, their employees and store patrons from outside threats as a "shield," the systems are actually being used as a "sword" to monitor and harass franchisees where they would otherwise have a reasonable expectation of privacy.

76.    In addition to improper in-store surveillance, 7-Eleven goes a step further to invade and subvert franchisees' privacy.

77.    Certain FOAGLA members such as Adnan Khan (and upon information and belief other FOAGLA members) have been trailed and followed by 7-Eleven's agents and/or employees while making bank deposits, at their homes and on their personal time. These tactics are criminal in nature and brazenly violate California's Anti-Stalking Statute, Cal. Penal Code § 646.9.

**D.    Misclassified Employer-Employee Relationship**

78.    7-Eleven's Franchise Agreements purposefully mischaracterize the relationship between itself and its franchisees as one of an independent contractor/franchisor.

79.    Language in 7-Eleven's form Franchise Agreements notwithstanding, the overwhelming and undisputed facts and circumstances surrounding the parties' relationship establish that extensive supervision, direction and control is exercised by 7-Eleven, and that an employer-employee relationship is what actually exists according to the appropriate test used by California courts. *See Ruiz v. Affinity Logistics Corp.*, Docket 12-56589 (9th Cir. June 16, 2014)(citing *S.G. Borello & Sons, Inc. v. Dep't of Industrial Relations*, 769 P.2d 399, 403 (Cal. 1989)).

80.     More specifically, 7-Eleven significantly controls the day-to-day operations of its franchisees, far beyond the "typical" franchisor-franchisee relationship, rendering the parties' relationship as one of *de facto* employment.

81.     The employer-employee relationship is evidenced by, among other things, a heightened and almost pathological level of control by 7-Eleven over its franchisees (including FOAGLA Members), including:

- Requirement that FOAGLA Members and all franchisees closely follow an unusually detailed 300-page operations manual that is supplemented weekly by various management directives as well as a 72 page monthly "Monthly Store Infrastructure, Quality and Service Evaluation" report card.  See Exhibit F, Operations Manual and 72 Page Monthly Store Infrastructure, Quality and Service Evaluation form being filed Under Seal;

- Regulation of vendors and product supply;

-Processing FOAGLA Members' payroll through 7-Eleven's own internal payroll;

-Regulation of product pricing, advertising and promotional items;

-Intense daily oversight of FOAGLA Members' Managers

-Requirement that FOAGLA members wear 7-Eleven uniforms at off-site events;

-FOAGLA members do not and cannot control the volume on their television; rather, 7- Eleven controls same from their corporate headquarters in Dallas, Texas.;

-FOAGLA members do not and cannot control the air conditioning or heat in their stores; rather, 7-Eleven controls same from their corporate headquarters in Dallas, Texas.;

-Bookkeeping and accounting is performed exclusively by 7-Eleven; and

- FOAGLA Members cannot withdraw money without 7-Eleven's approval.

82.     7-Eleven further asserts control by imposing fines on its franchisees, including but not limited to FOAGLA members (by way of Letter of Notice ("LONs"), Notice of Breach and/or Notices of Termination), or by alleging that franchisees are "under equity," (having less than the required $15,000 cash reserve) despite 7-Eleven's notoriously inaccurate accounting practices.

83.     These announcements of power to impose fines, and 7-Eleven's imposition of same, are strong indicators of employment type control.

84.     7-Eleven wholly controls the standards by which franchisees, including FOAGLA members, are reviewed. For instance, in or about May 2014, 7-Eleven issued a new Guest Experience Assessment ("GEA") Audit form. See GEA Exhibit G.

85.     Prior to its issuance, Plaintiff, nor franchisees, were consulted about the contents of the GEA Audit form.

86.     The GEA Audit is a multi-page document that 7-Eleven to control each and every aspect of franchisees' stores.  This is just further indicative of the employee-like relationship between 7-Eleven and its purported "franchisees."

87.     Franchisees are also wholly dependent on 7-Eleven for the opportunity to render services. By way of example, franchisees are unable to control the maintenance of the equipment in their stores, the volume on the television, etc., and thus, are not in business for themselves.

88.     7-Eleven's role is further indicative of an employer-employee relationship because 7-Eleven, *inter alia*: (i) controls employees' payroll and paychecks; (ii) owns and maintains all equipment; (iii) is responsible for sound, lighting and temperature, as well as all other aesthetics; and (iv) is responsible for marketing efforts, including, but not limited to, special promotions, the 7-Eleven website, and advertisements in publications and on the Internet.

89.      7-Eleven and its franchisees are engaged in the same type of business, and franchisees are not permitted to engage in certain other business activity outside of the operation of a 7-Eleven franchise.

90.      The relationship between the parties was set for a duration of years, (and despite 7-Eleven's efforts to thwart or inhibit business operations) the relationship has/had a degree to permanency to it.

91.      Further indicative of their status as employees is the fact that FOAGLA Members and all franchisees are integral to the 7-Eleven system and, but for Plaintiffs, 7-Eleven would be unable to operate in a manner similar to the one in which it currently operates.

## FIRST CLAIM FOR RELIEF

**(Violation of 42 U.S.C. §1981 and California Civil Code Section 51 *et seq.*)**

92.　Plaintiffs re-allege and incorporate by reference all of the allegations set forth in the preceding paragraphs as though fully set forth herein.

93.　42 U.S.C. §1981 provides for "equal rights under the law" and prohibits racial discrimination.

94.　Under 42 U.S.C. §1981, numerous members of FOAGLA are also members of a protected class as they are minorities of South Asian descent.

95.　7-Eleven has engaged in a systematic course of business ("Churning" which has had a discriminatory effect against South Asian franchisees, many of whom are FOAGLA members, to target, harass, falsely accuse and ultimately disenfranchise them in violation of 42 U.S.C. §1981 and California Civil Code Section 51 *et seq.*

96.　7-Eleven's business churning practices, upon information and belief, are known to 7-Eleven management to have discriminatory effect upon FOAGLA South Asian franchisees.

97.　7-Eleven has brought extensive litigation against South Asian franchisees in courts throughout the United States, even resorted to police-like interrogation tactics to create a fear of criminal exposure and deportation to innocent, but frightened and impressionable minority franchisees.

98.　As a result of 7-Eleven's illegal and discriminatory actions, numerous South East Asian franchisees have already been targeted and lost their business and this protected group, of which FOAGLA is substantially comprised, continues to be targeted and harassed to date.

## SECOND CLAIM FOR RELIEF

### (Invasion of Privacy (Intrusion into Seclusion) Through Improper and Excessive Surveillance; Violation of California Civil Code § 1708.8)

99.     Plaintiffs re-allege and incorporate by reference all of the allegations set forth in the preceding paragraphs as though fully set forth herein.

100.     Franchisees have a reasonable expectation of privacy in their stores, free of surveillance for the purposes not explicitly listed in the Franchise Agreements.

101.     Upon information and belief, 7-Eleven has violated this reasonable expectation of privacy by recording franchisees and their employees for purposes not agreed upon in the Franchise Agreements.

102.     Furthermore, upon information and belief, 7-Eleven has trailed franchisees with the use of unlicensed private investigators outside of the store while making bank deposits in violation of their right to privacy and California's Anti-Stalking Statute, Cal. Penal Code § 646.9.

103.     Such right to privacy was not waived or extinguished by the agreement to install security cameras in stores. The agreement does not permit 7-Eleven to videotape, follow, or trail franchisees outside of their stores.

## THIRD CLAIM FOR RELIEF

### (Retaliation/Violation of the California Franchise Relations Act, Section 20021)

104.     Plaintiffs re-allege and incorporate by reference all of the allegations set forth in the preceding paragraphs as though fully set forth herein.

105.     Upon information and belief, 7-Eleven has targeted successful franchisees and acquired their stores without compensation.

106.     Upon information and belief, 7-Eleven has specifically targeted FOA presidents and vocal association members. See McCord Certification.

107.     The sole purpose of acquiring franchisees' stores – albeit through illegal means – is to implement a corporate policy of "take back" and "churning" of

franchisee stores, at no cost, and ultimately resell the store, for a fee, to a third-party purchaser. Exhibit A, Certification of Former Corporate Investigations Supervisor Kurt McCord paragraphs 1 to 16. (Unsealed Docket No. 98-2, Naik v. 7-Eleven, 3:13-cv-4578, U.S.D.C of New Jersey).

108.     To achieve this goal, 7-Eleven hired more Asset Protection employees than any other company in 2013.

109.     Specifically, 7-Eleven hired approximately thirty-five Asset Protection employees.

110.     7-Eleven uses it Asset Protection/Loss Prevention ("AP/LP") Department as a profit center to realize a significant return on its investment in hiring large numbers of Asset Protection employees.

111.     Upon information and belief, 7-Eleven has instituted quotas to AP/LP Department which, in turn, incentivizes the AP/LP employees to bring dubious and fabricated charges based on unlawful and intimidating tactics.

112.     Unlike 7-Eleven, most retailers use their asset protection departments in a "non-productive" manner to limit losses from theft and shrinkage.

113.     However, 7-Eleven uses their AP/LP Department as a "productive work center" by taking back franchises at no cost to 7-Eleven – only to resell them for a larger fee by entering into store franchise agreements with more favorable terms for 7-Eleven.

114.     7-Eleven's effort to improperly "take over" franchises has been overwhelmingly profitable for 7-Eleven, albeit at the expense of the terminated franchisees.

115.     Such action is in violation of Cal. Corp. Code § 31220, which states: "It shall be a violation of this division for any franchisor, directly or indirectly, through any officer, agent or employee, to restrict or inhibit the right of franchisees to join a

1  trade association or to prohibit the right of free association among franchisees for any

2  lawful purposes."

3  116.   By targeting FOA presidents and association members, 7-Eleven is

4  restricting and inhibiting the right of franchisees to join a trade association

5  **FOURTH CLAIM FOR RELIEF**

6  **(Declaration that Franchisees are Employees under California State Law)**

7  117.   Plaintiffs re-allege and incorporate by reference all of the allegations set

8  forth in the preceding paragraphs as though fully set forth herein.

9  118.   Under California law, the right to control work details is the most important

10  or most significant consideration when determining whether an individual is an

11  employee or independent contractor.

12  119.   Notwithstanding representations to the contrary contained in 7-Eleven's

13  franchise agreement, 7-Eleven exerts such a tremendous amount of control over its

14  franchisees, the same renders their franchisees "employees" of 7-Eleven as opposed

15  to "independent contractors."

16  120.    Plaintiff's members are merely employees and in-store operators for 7-

17  Eleven. They have limited, if any, control over the day-to-day operations of any of

18  the stores, and are constantly and consistently berated and harassed by 7-Eleven.

19  121.   Despite the titles, which are inconsequential, the true relationship between

20  7-Eleven and Plaintiffs is one of employer-employee. 7-Eleven takes advantage of

21  the uneven and mischaracterized relationship by harassing Plaintiffs by and through

22  Zone Leaders, Market Managers and Field Consultants (collectively, "7-Eleven

23  Management" or "7-Eleven's Managers"). This harassment has caused serious and

24  injurious damage to each Plaintiff.

25  122.   7-Eleven's Franchise Agreements purposefully mischaracterize the parties'

26  relationship as one of an independent contractor/franchisor. Language in the

27  Franchise Agreements notwithstanding, the evidence establishes that sufficient

28

supervision, direction and control is exercised, and that an employer-employee relationship exists.

123.     7-Eleven, in actuality, significantly controls the day-to-day operations of its franchisees, beyond the normal franchisor-franchisee relationship, rendering the parties' relationship as one of *de facto* employment.

124.     Further details of 7-Eleven's intensive control evidencing a lack of Independent judgment found in employer/employee relationships is set forth in the Certification of Richard Schwarz a former 7-Eleven franchisee and Liaison Manager for 7-Eleven in Southern California.  The R. Schwartz Certification is attached hereto as Exhibit H.

125.     The employer-employee relationship is evidenced by, *inter alia*, a high level of control that is exerted by 7-Eleven over the following:

> a.     Regulation of vendors and product supply;
>
> b.     Processing franchisee payroll through 7-Eleven's own internal payroll system;
>
> c.     Regulation of product pricing, advertising and promotional items;
>
> d.     Intense daily oversight by 7-Eleven's Managers of Plaintiffs' operations;
>
> e.     Requirement that franchisees wear 7-Eleven emblazoned uniforms, both in the store and at off-site events;
>
> f.     Franchisees cannot control the volume on their television; rather, 7-Eleven controls same from their corporate headquarters in Dallas, Texas.;
>
> g.     Franchisees cannot control the air conditioning or heat in their stores; rather, 7-Eleven controls same from their corporate headquarters in Dallas, Texas.;
>
> h.     Franchisees cannot own active business interests in other business entities;

i.      Bookkeeping and accounting is all done by 7-Eleven; and

j.      Franchisees cannot withdraw money without 7-Eleven's approval.

126.    Further details of 7-Eleven's intensive control evidencing a lack of Independent judgment found in employer/employee relationships is set forth in the Certification of Richard Schwarz a former 7-Eleven franchisee and Liaison Manager for 7-Eleven in Southern California is attached hereto as Exhibit H.

127.    7-Eleven further asserts control by fining Plaintiffs (by way of Letter of Notice ("LONs"), Notice of Breach and/or Notices of Termination), or by alleging that Plaintiffs are "under equity," despite 7-Eleven's notoriously inaccurate accounting practices.

128.    These announcements of power to impose fines, and 7-Eleven's imposition of same, are strong indicators of employment, vis-à-vis control.

129.    Moreover, 7-Eleven wholly controls the standards by which Plaintiffs are reviewed. By way of example, in or about May 2014, 7-Eleven issued a new Guest Experience Assessment ("GEA") Audit form. See Exhibit H.

130.    Prior to its issuance, Plaintiff, nor franchisees, were consulted about the contents of the GEA Audit form.

131.    The GEA Audit is a multi-page document that 7-Eleven to control each and every aspect of franchisees' stores.

132.    This is just further indicative of the employee-like relationship between 7-Eleven and its purported "franchisees."

133.    Plaintiff's members are wholly dependent on 7-Eleven for the opportunity to render services. By way of example, franchisees are unable to control the maintenance of the equipment in their stores, the volume on the television, etc., and thus, are not in business for themselves.

134.    7-Eleven's dominant role and rigid oversight is further indicative of an employer-employee relationship because 7-Eleven, *inter alia*: (i) controls

employees' payroll and paychecks; (ii) owns and maintains all equipment; (iii) is responsible for sound, lighting and temperature, as well as all other aesthetics; and (iv) is responsible for marketing efforts, including, but not limited to, special promotions, the 7-Eleven website, and advertisements in publications and on the Internet.

135.   7-Eleven and its franchisees are engaged in the same type of business, and Plaintiffs are not permitted to engage in certain other business activity outside of the operation of a 7-Eleven franchise.

136.   The relationship between Plaintiff's members and 7-Eleven was set for duration of years, and despite 7-Eleven's now-constructive termination, the relationship has/had a degree to permanency to it.

137.    Plaintiff's franchisee members are integral to the 7-Eleven system and, but for Plaintiffs, 7-Eleven would be unable to operate in a manner similar to the one in which it currently operates.

138.    For all of these reasons, FOAGLA members and all 7-Eleven franchisees should be deemed "employees" under the control analysis imposed under California law.

## PRAYER FOR DECLARATORY RELIEF

**WHEREFORE,** Plaintiffs respectfully request that this Court enter an Order declaring and adjudging as follows:

1.   7-Eleven has violated 42 U.S.C. §1981 by purposely targeting, harassing and threatening FOAGLA Members and all franchisees of South Asian descent;

2.   Eleven is in violation of California Civil Code § 1708.8 by invading the privacy through intrusion into seclusion of the franchisees;

3.    7-Eleven has violated Section 20021 of the California Franchise Relations Act through its churning scheme aimed at retaliating against outspoken and minority franchisees.

4.    7-Eleven's franchisees, including but not limited to FOAGLA members, are employees, and not independent contractors, and have been misclassified under the terms of the 7-Eleven franchise agreement;

5.    Any and all Attorneys' fees and Costs to which Plaintiffs may be entitled; and

6.    Such other and further relief in favor of Plaintiffs as this Court deems just and equitable.

Dated: July 11, 2014       /s/ Eric J. Schindler
                             Eric J. Schindler
                             Schindler Law Group
                             20321 SW Birch Street, Suite 200
                             Newport Beach, California 92660
                             Phone: 949-483-8700
                             Fax: 949-464-9714
                             Email: eric@schindlerlaw.net

                             Gerald A. Marks (*Pro Hac Vice* Forthcoming)
                             Louis D. Tambaro (*Pro Hac Vice* Forthcoming)
                             Evan M. Goldman (*Pro Hac Vice* Forthcoming)
                             MARKS & KLEIN, LLP
                             63 Riverside Avenue
                             Red Bank, New Jersey 07701
                             Phone: 732-747-7100
                             Fax: 732-219-0625
                             Email: jerry@marksklein.com
                             Email: louis@marksklein.com
                             Email: evan@marksklein.com

# DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated:  July 11, 2014

/s/ Eric J. Schindler
Eric J. Schindler
Schindler Law Group
20321 SW Birch Street, Suite 200
Newport Beach, California 92660
Phone: 949-483-8700
Fax: 949-464-9714
Email: eric@schindlerlaw.net

Gerald A. Marks (*Pro Hac Vice* Forthcoming)
Louis D. Tambaro (*Pro Hac Vice* Forthcoming)
Evan M. Goldman (*Pro Hac Vice* Forthcoming)
MARKS & KLEIN, LLP
63 Riverside Avenue
Red Bank, New Jersey 07701
Phone: 732-747-7100
Fax: 732-219-0625
Email: jerry@marksklein.com
Email: louis@marksklein.com
Email: evan@marksklein.com

## **VERIFICATION**

I am one of the named plaintiffs in the above-entitled action. I have read the foregoing complaint and know the contents thereof. The same is true of my own knowledge except those matters which are therein stated on information and belief, and as to those matters, I believe it to be true.

I declare under the penalty of perjury under the laws of the United States of America that all of the foregoing is true and correct.

July 10, 2014

_____

Plaintiff Jas Dhillon

I am one of the named plaintiffs in the above-entitled action. I have read the foregoing complaint and know the contents thereof. The same is true of my own knowledge except those matters which are therein stated on information and belief, and as to those matters, I believe it to be true.

I declare under the penalty of perjury under the laws of the United States of America that all of the foregoing is true and correct.

July 10, 2014

_____

Plaintiff Gurtar Sandhu

I am one of the named plaintiffs in the above-entitled action. I have read the foregoing complaint and know the contents thereof. The same is true of my own knowledge except those matters which are therein stated on information and belief, and as to those matters, I believe it to be true.

I declare under the penalty of perjury under the laws of the United States of America that all of the foregoing is true and correct.

July 10, 2014

_____

Plaintiff Serge Haitayan