Gerald A. Marks (*Pro Hac Vice* Forthcoming)
    Email: jerry@marksklein.com
Louis D. Tambaro (*Pro Hac Vice* Forthcoming)
    Email: louis@marksklein.com
Evan M. Goldman (*Pro Hac Vice* Forthcoming)
    Email: evan@marksklein.com
MARKS & KLEIN, LLP
63 Riverside Avenue
Red Bank, New Jersey 07701
Phone: 732-747-7100
Fax: 732-219-0625

Eric J. Schindler (CA Bar No. 141386)
    Email: eric@schindlerlaw.net
SCHINDLER LAW GROUP
20321 SW Birch Street, Suite 200
Newport Beach, California 92660
Phone: 949-483-8700
Fax: 949-464-9714

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

| | |
|---|---|
| FOAGLA, INC., a California corporation, on behalf of itself and the Bakersfield FOA, the Central California FOA, Inc., the Central Valley FOA, the Greater Bay FOA,  the Joe Saraceno FOA, the Northern California FOA,  the San Diego FOA, the Sacramento Valley FOA, the Sierra FOA, Cal-Neva FOA, Inc., and the San Francisco-Monterrey Bay FOA; and Jas Dhillon, an individual; Gurtar Sandhu, an individual; Serge Haitayan, an individual; Ray Dhaliwal, an individual; Tarlochan Rangi, an individual; and John Does 1-1000 who are similarly situated California individual 7-Eleven franchise owners, | Case No.: <br><br> EXHIBITS A  - E, G, H |

                                         Plaintiffs,
        v.

7-ELEVEN, INC**.**, a Texas corporation,

                                         Defendant.

1

# Exhibit A

## CERTIFICATION of KURT McCORD

1. My name is Kurt McCord. I am a CFI (Certified Forensic Interviewer).

2. I was a Corporate Investigations Supervisor for 7-Eleven Inc. for over seven months in 2013.

3. Prior to that time, I held a position as a Loss Prevention Supervisor at Burlington Coat Factory, and Executive Team Leader of Asset Protection for Target stores. I was also an Investigations Technician for Target's ORC Investigations Center, where I initiated and investigated complex Organized Retail Crimes (ORC) and internal theft investigations. (A full description of my professional experience, loss prevention certifications and education is attached as Exhibit A).

**Summary of 7-Eleven's Predatory Practices**

4. I am making this certification to outline the unfair, illegal, and predatory practices of the 7-Eleven corporation against its franchisees across the United States.

5. 7-Eleven, Inc. has designed and implemented a predatory program to increase corporate profits by unethically stealing the equity and goodwill of its franchisees. In some cases, these franchisees spent decades of hard work and financial investment building their businesses.

6. 7-Eleven's scheme was to use its superior financial, legal, and corporate strength to seize the stores of profitable franchisees without providing them fair compensation for the years of goodwill they accumulated. The 7-Eleven Corporation would then resell those stores at an enormous profit.

7. Using an internal team masquerading as an Asset Protection (Loss Prevention) Department, 7-Eleven set a yearly number of stores to take back, prioritizing locations in areas with the highest resale values or, in some cases, operated by respected franchisees who had spoken out about the corporate giant's corrupt practices.

8. To understand 7-Eleven's illicit schemes, one must understand how franchisee-franchisor relationships and Asset Protection/Loss Prevention programs are designed to work.

1

**How <u>ethical</u> franchisor/franchisee relationships work**

9.    The franchisor-franchisee relationship is defined as one of mutual self-interest with a common goal of mutual success.

10.   Franchisors like 7-Eleven receive their revenue from up-front franchise fees that are paid when the new franchisee signs on, and an ongoing percentage of the franchisee's revenue.

11.   The relationship is intended to be a symbiotic one, with the franchisor providing the tools and guidance for the franchisee to build a successful, profitable business for both parties. Throughout the term of the agreement, the franchisee, in turn, compensates the franchisor with a share of profits.

12.   Sometimes corporate greed or the intense internal pressure to increase profits leads franchisors to abuse their dominance over franchisees through an illicit practice known as "churning."

13.   When "churning," a franchisor allows or expedites the failure of a franchisee's store, or seizes it for alleged breaches of the franchise agreement (as in 7-Eleven's case). Then, the franchisor will resell it to a new franchisee for new (and often higher) franchise fees.  In fact, the same location can be sold over and over again with the franchisor reaping new fees and increased profits with each "churn."

14.   This relentless quest for higher profitability and greater control led 7-Eleven, Inc. to adopt a strategy of "churning" franchise locations. This acted as a way to generate tens of millions of dollars in additional profits, and as also became an effective way to rid the system of "pain in their ass" franchisees who dared question 7-Eleven's predatory practices.

15.   In order to deploy an aggressive churning initiative, 7-Eleven, Inc. needed to disguise it as something more professional and benign.

16.   7-Eleven decided to conduct their churning initiative under the guise of an Asset Protection (Loss Prevention) department. They named the two teams that acted as the warhead of the scheme the "Centralized Investigations Team" (CIT), and a covert mobile surveillance team that they dubbed the "Profit Assurance Team" (PAT Team).

2

It was communicated to 7-Eleven that the term PAT Team is redundant, but they insisted that the term continued to be used incorrectly.

**How industry standard Asset Protection (Loss Prevention) works.**

17. Traditionally, Asset Protection departments (also called Loss Prevention departments) are used to reduce company losses that occur as a result of customer crimes and employee theft.

18. The goal of Asset Protection departments is to prevent losses caused by deliberate human actions such as theft, fraud, vandalism, waste, abuse, or misconduct.

19. Asset protection departments are intended to prevent losses for store operators and the parent corporations and are **NOT regarded as profit centers or generators of new revenue.**

20. Additionally, Asset Protection departments of reputable major corporations are governed by strict rules and procedures that are documented and distributed to all Asset Protection personnel.

21. Legitimate asset protection departments seek prosecution of criminal violations in criminal court, **not civil court.**

22. Reputable Asset Protection departments focus on the areas of greatest potential loss, not on stores with the highest resale value or those with operators disliked by corporate executives.

23. Reputable Asset Protection departments use industry-accepted procedures, such as the Wicklander-Zulawski (W-Z) interview technique to interview suspects.

24. They do not deploy abusive tactics such as prolonged interrogations, cultural shaming, deprivation of food or water, "third degree" questioning or false imprisonment.

**7-Eleven's Centralized Investigations Team (CIT) is disguised as theft prevention**

3

25.     Masquerading under the guise of an asset protection department, the 7-Eleven Asset
        Protection team engaged in the aforementioned tactics and more.

26.     Their goal was not to prevent retail theft, but to create a new profit center to acquire
        franchisee stores at no cost through tactics that sometimes consisted of false charges
        of franchisee wrongdoing and intimidation of franchisees.

27.     The result of the forced acquisition of franchisee stores at no cost was the seizure of
        franchisee equity that was established as the result of many years of faithful service to
        both 7-Eleven customers and the 7-Eleven corporation. These stores are resold by 7-
        Eleven corporate for profits in excess of $200,000 per store or more, resulting in
        unfair windfall profits to corporate 7-Eleven.

28.     Ironically, 7-Eleven's loss prevention program – which should have been designed to
        protect the corporation and its franchisees from dishonest employees and guests – was
        actually designed to facilitate the plundering of franchisee stores by 7-Eleven, Inc.

**The 7-Eleven Store Seizure Initiative**

29.     The practice by 7-Eleven, Inc. to "churn" franchisee stores to increase corporate
        profitability is not a new endeavor.  In fact, franchise fees improperly realized by 7-
        Eleven corporate for stores improperly taken back during the past several years is
        estimated to be in the tens of millions of dollars.

**7-Eleven's mass hiring of Asset Protection investigators**

30.     In 2013, 7-Eleven, Inc. initiated an unprecedented initiative to boost corporate profits
        through the creation of an aggressive franchise store seizure and resale program.

31.     To facilitate this aggressive initiative, 7-Eleven, Inc. empowered VP Mark Stinde to
        staff the Centralized Investigations Team (CIT) and the covert mobile surveillance
        team that *he* dubbed the Profit Assurance Team (PAT Team).

32.     The D&D Daily reported in 2013 that 7-Eleven hired more Asset Protection
        investigators than any other company (see Exhibit B from D&D Daily, a daily loss

4

prevention newsletter that features news and information relevant to the Loss Prevention industry).

### 7-Eleven Asset Protection established as a predatory profit center

33. The role of the 7-Eleven Asset Protection department is unlike any other Asset Protection department of which I'm aware.

34. Asset protection departments are used by reputable retailers as "non-productive" work-centers, and merely seek to mitigate losses from theft, fraud, and operational shrink.

35. Instead, 7-Eleven uses its AP/LP department as a *"productive work center"*. Franchises are taken back from franchisees, and franchisees are not paid for the equity or "Goodwill" they have built into the business. The store is then resold for profit.

36. This process is known in 7-Eleven Asset Protection as a "take-back".

37. After a take-back, the store will temporarily become a "corporate store." Corporate employees will temporarily take controls of the store to determine how much to charge a prospective new franchisee. This is after the profitability of that particular store as a new "corporate store" is assessed.

### Mass hiring of 7-Eleven Asset Protection employees were made covertly

38. When Vice President Mark Stinde was given the green light for the mass-hiring of the AP department that he would control, the positions weren't posted publicly. The hiring was done covertly. 7-Eleven did not want its franchisees to know the reason behind the group being hired. 7-Eleven, Inc. wished to preserve the element of surprise when an increased quantity of stores began to be taken back.

39. Having hired so many new AP/LP professionals, the pressure for Asset Protection department executives to provide a return on investment (ROI) was immense.

5

**Exhibit A**
**Page 5 of 25**

**CIT pressured to meet franchise take-back quotas**

40.   While most Asset Protection programs are reactive to actual levels of theft or shrinkage, Stinde established quotas in advance for the number of stores to be seized in a given year.

41.   For example, in September 2013, at a meeting in Dallas, the VP of AP, Mark Stinde, communicated to the Asset Protection directors and set the **store take-back quota for 2014 at 120 stores.**

42.   When quotas are instituted in a franchisor loss prevention department, the pressure to meet them may cause the AP/LP individuals to bring frivolous or even fictitious charges against franchisees in order to meet the quota.

**AP department prioritized take-backs with highest resale value**

43.   A major factor 7-Eleven, Inc. used for prioritizing which stores to target for seizure was the franchise resale value of the market in which the franchise was located.  It was determined that 7-Eleven stores in California, New Jersey, and New York could command the highest resale price, so franchisees with stores in those states were priority targets.

44.   So, for example, even if evidence existed that a franchisee in the Midwest was committing more fraud against 7-Eleven than a store in California, New Jersey, or New York, the priority for take-back would go toward the stores in California, New Jersey, and New York. These stores are more profitable to refranchise  and will be prioritized, even if crimes are less severe than the franchisee in the Midwest.

**AP department maliciously targeted influential, outspoken franchisees**

45.   Another major criteria in the selection of stores for take-back was whether the franchise owner was deemed a "pain in the ass" (in the words of Mark Stinde).

Exhibit A
Page 6 of 25

46.     Several long-time franchise owners were designated as high-priority targets for fraud investigations by top executives because of their roles as heads of regional Franchise Owners Associations (FOAs), and their advocacy on behalf of fellow franchisees.

47.     Stinde and top executives continued to pressure the CIT staff to "dig up dirt" on prominent financially successful franchisees such as Jerry Sahnan, head of the Arizona FOA, and Karamjeet Sodhi, head of the New Jersey FOA. Even after investigators reported not being able to find evidence of fraud or other improprieties, top executives insisted they remain "Top Priority" targets.

**The Highly Dysfunctional Nature of the CIT**

48.     The sector of the 7-Eleven Asset Protection department known as the Centralized Investigations Team (CIT) was (and likely still is) a rogue unit. This team was highly dysfunctional in design, mission, implementation, and management. This dysfunction played an important role in the improper targeting of innocent franchisees and the seizure of their stores.

**Lack of clear rules and procedures**

49.     While the overwhelming number of retailers have Asset Protection/Loss Prevention Directives and Standard Operating Procedures that govern the conduct of their respective Asset Protection employees, 7-Eleven had no rules or procedures.

50.     Without any safeguards in place, the pressure on AP/LP employees for ROI on the investment made in their hiring led to improper actions and improprieties outlined in franchisee lawsuits.

51.     There were ZERO directives or rules that governed 7-Eleven Asset Protection employees.

52.     This caused absolute chaos in trying to determine how to proceed in even the most trivial situation.

**A quota-based system designed to generate profit**

7

53.   The pressure to provide an ROI by AP/LP employees that were hired in 2013 resulted in false acquisitions of wrong doing against franchisee Dilip Patel, Karamajeet Sodhi, and other franchisees and their families.

54.   Both the Dilip Patel and Karamajeet Sodhi stores were located in aforementioned geographic areas that were targets for "take-back".

**Time and morale squandered by shifting directives**

55.   The Centralized Investigation Team, a 16 member unit hired by 7-Eleven to take back stores of Franchisees committing fraud, was redirected on June 17th, 2013. This was the day that the stores of franchisee Farook Baig were raided by the government for violations of employment and immigration laws. The CIT was essentially still in training, and hadn't even grasped its primary objectives for which they were hired.

56.   On June 17th, 2013, CEO Joe DePinto stopped by "The War Room", where the CIT was training, and stated that the CIT's job would be to help insure that those events didn't happen again.

57.   Despite the fact that CIT personnel had no experience investigating payroll or immigration matters, we were told by Mark Stinde to focus on franchisee infractions in those areas as a means of terminating their franchise agreements.

58.   From June 17th, 2013 until December 2013, the CIT's primary objective was to focus on payroll and immigration investigations, in part to insure that 7-Eleven wasn't publically humiliated like they were in the Farook Baig matter.

59.   Shortly after the raids, a tip line was implemented. Anyone who suspected undocumented workers existed in 7-Eleven stores were encouraged to call this tip line, and HUNDREDS of these tips came in over the next 6 months. Every single tip was assigned to an investigator in the CIT, and they were prioritized on how severe the tip was perceived. At any given time, each of the 12 investigators in the CIT could have as many as 80 of these investigations.

8

60.    Late in 2013, Mark Stinde redirected focus back on fraud and away from payroll and immigration investigations. We were told by Mark Stinde that the franchisee agreement would only support the ousting of a franchisee for payroll or immigration issues if the franchisee was convicted of a crime involving these specific issues. So essentially, this meant that everything the CIT had done since our mission had changed on June 17th was not viable in any take-back. This upset many of the CIT investigators, and increased dissention and dissatisfaction in the ranks of the CIT.

61.    Shortly after it was communicated to us that payroll and immigration investigations were not viable to take back stores, Stinde, Hale, and Lazo began trying to move the CIT away from payroll and immigration issues. Hale and Lazo created a plan on how future immigration and payroll cases would be worked.

62.    In November 2013, it was well known that if an immigration case emerged where we had a credible tip that people might be in danger, 911 would be called.

63.    The shifting priorities and misinformation provided by management took a major toll on the morale of the CIT investigators and supervisors who were constantly being redirected away from what they were hired to do:  detect fraud and catch thieves.

**Lack of reliable data made payroll investigations useless**

64.    When Federal Investigators began charging 7-Eleven franchisees for wage and immigration violations, 7-Eleven began pushing greater scrutiny of franchisee labor practices.

65.    However, 7-Eleven, Inc. had historically failed to implement or enforce accurate data collection from franchisee stores, making it all-but-impossible to determine how many labor hours franchisees were expending per-store.

66.    99% of all payroll investigations conducted by the CIT were absolutely useless, because everyone shared employees between stores, and manually entered punches.

67.    Not once did I see a payroll report where an employee punched in and out through 7-Eleven's system correctly, and I looked at hundreds of these payroll reports.

9

68.   For example, a franchisee, let's call him "Joe", has three 7-Eleven stores and is suspected of employing people off the books.

69.   The CIT investigator assigned to the case will request one week's payroll from all three of the franchisee's stores.

70.   This will give him names of employees, the hours they worked, their pay rates, and the total amount they were ultimately paid for said week.

71.   The investigator knows that each store must have at least 168 hours of payroll, because each store is open 168 hours per week. However, multi-unit franchisees like Joe generally share employees between stores. So, the cashier might be paid out of store 1, but may also work at stores 2 and 3 as needed in a week's time.

72.   An analysis of this will show that store 1 has 800 hours of payroll in a week, and the other 2 stores may only have 100 hours respectively.

73.   At first glance, it looks suspicious. How can stores 2 and 3 be open 168 hours per week, but only have 100 hours of payroll a piece? The reason is the franchisee might have 4 or 5 "floaters" that he pays out of store 1, but could work at any store on any given day.

74.   The employee is not going to clock in at stores 2 and 3 because it's more of a hassle for the franchisee to keep track.

75.   So, the employee has been instructed by the franchisee to keep track of hours, and when it's time to do payroll, the franchisee calls the employee and asks "what are your hours for this week?" The employee says, " Joe, I worked exactly 40."

76.   What does the franchisee do? He enters the hours like this: Monday 8am-4pm, Tuesday 8am-4pm and so on. The employee may have been off Monday, but the franchisee enters them concurrently to save time and energy. Joe had never been told he couldn't do it this way.

77.   7-Eleven Inc. was historically "hands off" with franchisee employees. Their position has historically been that it's the franchisee's money paying his people, not 7-Eleven's.

78.   This example of the franchisee manually entering hours for his employees, and not having them punch in and out is THE RULE, not the exception.

10

79. Therefore, 99% of ALL payroll investigations we conducted were absolutely useless. The franchisee shared employees ("floaters") between stores, and manually entered hours as "perfect punches."

80. Perfect punches are when hours are keyed manually into the payroll system and entered on the hour, for example, 8:00am – 4:00pm.

81. If an employee works different intervals across multiple stores and days, the hours are entered in a simplified, "perfect" fashion, often concurrently at a single store.

82. Not a single franchisee that I ever came across actually did payroll accurately. These "perfect punches" negated the effectiveness of payroll investigations.

83. When everyone is just entered into the system manually to get paid for the hours that they worked for that pay period, it's impossible to see who is where, who is who, and what's going on.

84. Most importantly, this systemic mess of inaccurate payroll reporting has been tolerated, repeated, and institutionalized for decades.

85. 7-Eleven has a brigade of individuals working in the payroll department, and some have worked there for decades. They have seen these franchisees turn in these hours, they have processed these hours, and issued checks to these individuals for years.

86. It's obvious that 30 hours of payroll from a store that's open 168 hours per week is impossible. However, it was tolerated, and to my knowledge, unquestioned and uninvestigated up until June 2013. .

87. It was amazing how quickly payroll and immigration issues became a priority when the US Government started asking questions about wages and immigration.

88. However, with 7-Eleven corporate having turned a blind eye to these issues for decades, it was impossible to conduct efficient and meaningful investigations based on the available information and the status quo.

**7-Eleven's Interrogation of Dilip and Saroj Patel.**

89. A microcosm of the way 7-Eleven's Asset Protection team operates is the case of Dilip and Saroj Patel.

11

90.    7-Eleven Asset Protection interrogators displayed unprecedented intimidation in the temporary imprisonment of Dilip, and Saroj Patel.

91.    This 8-hour interrogation resulted in the loss of the business they had spent 19 years developing.

92.    Dilip and Saroj Patel are grandparents in their sixties, and are beloved by the community and the customers of their Riverside, CA 7-Eleven store.

93.    7-Eleven Asset Protection personnel subjected them to an 8-hour interrogation session using tactics more befitting murder suspects than franchisees accused of improperly redeeming Slurpee coupons.

94.    As a Certified Forensic Interviewer, I've never heard of a private sector interrogation lasting more than 2 hours. 7-Eleven's interview of Dilip and Saroj Patel lasted 8 hours, and then Dilip Patel was required to do a "final walk" of the store he was forced to give up.

95.    By the time Dilip Patel signed over his store and his livelihood, he had been without food for 8 hours. He had been subjected to threats of federal lawsuits and prison time. He was distraught with the toll the interrogation was taking on his diabetic wife, Saroj, who was getting increasingly upset.

96.    Legitimate, law abiding, ethical Asset Protection interviewers would not resort to such cruel and extreme tactics. They would adhere to industry-standard interview techniques, like the Wicklander-Zulawski (W-Z) interviewing technique.

97.    The Wicklander-Zulawski (W-Z) system of interviewing suspected employees for theft is the industry standard in the corporate world of Loss Prevention/Asset Protection. In fact, 7-Eleven, in recruiting for Asset Protection candidates for the very position of the individuals who interviewed the Patels', indicates a preference in the job description for individuals who have completed W-Z training.

98.    There was **only one reason** an interrogation like the 7-Eleven interviewers was necessary:

99.    **7-Eleven didn't have enough evidence on the Patels to proceed with the lawsuit without them signing over the store.**

12

100.   Their true motive was to gain full control of the Patel's valuable store, so they resorted to extremely cruel and coercive tactics.

101.   The whole point of a Wicklander-Zulawski interview is to _**minimize**_ the seriousness of the crime and situation. "Trigger" words like "arrest," "jail," "police," "steal," "lie," and "termination of employment" are not to be used. If the suspect is triggered to think about consequences, in most cases, they will not admit. Instead of "steal," "take" or "borrow" would be used, etc.

*102.*   7-Eleven investigators did not follow the Wicklander-Zulawski interview method or other acceptable method in the interrogation of the Patels.  One can surmise that the interrogators deviated from the accepted techniques used in legitimate investigations, because they were desperate to gain control of the store due to lack of evidence.

### 7-Eleven's 8-hour Interrogation of Dilip and Saroj Patel

103.   On Wednesday, December 4th, 2013, at approximately 10:00am, Dilip Patel received a call from Market Manager Bill Halverson (a Market Manager for 7-Eleven generally has 80-100 stores, and supervises 7 to 10 Field Consultants who are responsible for around 10 stores respectively).

104.   During this conversation, Halverson told Dilip that he wanted to schedule a meeting with him and his wife for the following day, December 5th, 2013, at 10:00am, to discuss store financials. Dilip felt immediate anxiety about this meeting because Halverson had specifically mentioned that he wanted Saroj, his wife, in attendance. It was known that Mrs. Patel did not participate in the daily operations of the store.

105.   The meeting was held in a RGIS office building in Riverside, California. RGIS is the company that handles inventory audits for 7-Eleven.

106.   When Dilip, Saroj and their son Dev Patel (who was the daily manager of the store's operations) entered the building, Market Manager Bill Halverson was waiting for them. He seemed very nervous to see Dev Patel, and asked Dev to wait in the lobby. Dev begrudgingly complied with this request initially.

13

107.  Dilip and Saroj were then led into a small conference room where Asset Protection Specialists Steve Kellison and Kevin New were sitting.

108.  When the Patels sat down at the table, the first words out of Kellison's mouth contained a threat. Kellison stated that one of two things would happen that day. The Patels would either give up their store, all of the money in their equity account, and pay $100,000 in damages, or 7-Eleven would file a federal lawsuit against them for $250,000.

109.  They were told that if they left the premises, that the lawsuit would be filed immediately. Absent were the elements that are the foundation of a Wicklander-Zulaski interview. Kellison did not try to build rapport, or explain what he and New did for the company. Kellison opened with a threat.

110.  The interview conducted by Kellison and New lasted eight (8) hours, and was conducted with "Third Degree Tactics".

111.  After the initial threat made by Kellison, he stated that the Patels had been using Slurpee coupons fraudulently. He accused them of "double dipping." This is interpreted as the Patels were taking cash payments for Slurpees that were offset with Slurpee coupons, and not sharing these cash profits with 7-Eleven.

112.  The Patels denied doing this. Kellison then showed the Patels two very short clips of videos accompanied with the electronic journals (receipts) of the transactions.

113.  The videos were of Dilip and Saroj conducting what Kellison insisted were instances of the aforementioned coupon fraud. Dilip felt that the videos and the electronic journal that accompanied them didn't seem to match up. After the video was played, Dev entered the conference room. Dev's repeated requests to replay the video were denied by Kellison.

114.  In a W-Z interview, evidence is traditionally shown as an absolute last resort, *if ever*. There are countless articles and documents related to the W-Z interview technique that strongly recommend against ever showing any evidence in an interview.

115.  The aforementioned video evidence was shown in the first few minutes of an 8 hour interrogation! If the video was so compelling that it needed to be shown at the beginning of an interview, then it is extremely suspicious that requests to replay it would be denied.

14

116.   Such tactics cast doubt on the authenticity of the video. It was common knowledge to 7-Eleven that Dilip and Saroj were not active in the day to day operations of the store.

117.   The store was run by their son, Dev. Dev was more familiar with the way the POS (Point of Sale) terminals functioned, and may have been able to spot inconsistencies in the video, which would explain why they refused to replay the video for Dev.

118.   After the video was shown, Dilip again denied any wrong doing. It was at this time that Kellison made more threats, and engaged in what I can only describe as "cultural shaming."

119.   He stated that if the Patels refused to sign over the store, and a federal lawsuit was filed, this would become a public embarrassment for the Patels. It is the Patels' and my belief that this threat was used to exploit the cultural biases against theft in the Indian culture. Although being accused of theft in the Anglo culture is considered shameful, it is not nearly as taboo as it is in the Indian culture.

120.   Using cultural biases as collateral to get an admission is unethical conduct for an interrogator. However, 7-Eleven took it even one step further.

121.   **Kellison also stated that if 7-Eleven filed on the Patels in federal court, that the IRS could hear about it, and Dilip and Saroj Patel could face jail time.**

122.   **Kevin New then informed the Patels that his mother used to work for the IRS, and these types of lawsuits have "a way of getting out" to the IRS.**

123.   **This IRS threat changed the entire dynamic of the interview. Now, the threat was not just about money, it was about confinement. If they refused to sign over the store, the perceived threat was news of the lawsuit would be leaked to the IRS, and the Patels would go to prison.**

124.   **This threat had a major emotional impact on Saroj Patel, and she began to cry and raise her voice at the 7-Eleven interrogators. I believe this furthers the argument and makes this an almost textbook case of false imprisonment.**

125.   Dev then asked Kellison if he could see a copy of the documented complaint against the family. It was during this time that Saroj began to get even more upset, crying uncontrollably, and became inconsolable.

126.   After refusing at first to do so, they finally let Dev see the documentation.

15

127.    Next, Dev asked if the family could have some time to let their attorney look over the complaint. They again denied this request and stated that if they left the premises, the federal lawsuit would be filed.

128.    Dev, as a last resort, asked if an attorney would be allowed to meet them at the office building to look over the complaint. After each of the questions that Dev and Dilip would ask of the 7-Eleven Asset Protection Specialists, the pair would leave the room to consult with counsel, and then eventually come back with an answer.

129.    Finally, the Patels were allowed to call an attorney to meet them at the office. However, they were again warned that if they left the premises, a federal lawsuit would be filed against them.

130.    However, the attorney that Dilip knew that dealt with franchisee issues was unavailable. It was at this time, Saroj, a diabetic, became weak and needed to eat something.

131.    The interrogation was well into it's 3rd hour. Dev was allowed to take Saroj to get some food, but Dilip was required to stay because they had not agreed to sign over the store.

132.    While away getting Saroj food, Dev called a friend who was a young, inexperienced attorney, and asked him to stop by the Regis office and look at the complaint.

133.    Dev then returned to the conference room with his attorney friend who looked over the complaint. It was after he arrived that Patricia Hollenbeck of the law firm Duane Morris (representing 7-Eleven) came into the room.

134.    After reviewing the complaint, the inexperienced attorney realized that he couldn't provide much help in that particular situation, and subsequently left.

135.    It was at this time that Dilip Patel informed me that he lost all hope. He thought about all of the customers he had become close friends with in the last 19 years, and how devastating it would be to lose touch with all of them.

136.    He felt for his son, Dev, who was a new father with a newborn at home. This would take away Dev's livelihood, too. Dilip also felt deep sadness for his employees, one of which had been with him for 17 years. His employees would be devastated, both emotionally and financially.

16

137. He didn't feel like he would be able to leave that day if he did not sign over control of the store. The relentless tactics made by 7-Eleven investigators proved that they were not going to take "no" for an answer. He stated that he could not take the chance of going away and not having a relationship with his new grandchild.

138. So, late on Thursday, December 5th, Dilip conceded the fight and began negotiations into the surrendering of the store he had owned for 19 years.

139. The tactics used by 7-Eleven were not only offensive to ethical interviewers, they are offensive to any reasonable human being, and I believe they might have even been unlawful.

**7-Eleven's Vendetta Against Franchise Leader Jerry Sahnan**

140. **The fact that the true mission of the 7-Eleven Asset Protection program is not legitimate loss prevention is evident in the case of Jerry Sahnan**

141. Targeting innocent franchise owners (including Karamjeet Sodhi) in a predatory manner is made clear in this internal account of the vendetta waged against the head of the Arizona 7-Eleven Franchisee Owners Association.

142. Shortly after the Farook Baig raids on June 17th, 2013, the CIT group was given its first high priority mission, Jerry Sahnan. Sahnan was assigned to the CIT's investigator, Michael (Mike) Aldridge by Mark Stinde.

143. The CIT was told that a Market Manager had a conversation with Sahnan about illegal immigrants working in his stores. Sahnan voluntarily came forward and stated that there were several undocumented workers in his store. He stated that almost all of the franchisees he knew employed undocumented workers, and he wasn't aware that 7-Eleven was opposed to this practice. Sahnan said that he would correct the issue, and he did.  He fired all of his undocumented workers and replaced them with legal ones.

144. Kevin Hale, the Corporate Investigations Manager, is the head of the CIT. He had weekly meetings with the Vice President of Asset Protection Mark Stinde, Brad

17

Jenkins (Mark's boss), and **COO Darren Rebelez**. These meetings were to discuss the work that the CIT had been conducting on payroll and immigration investigations.

145. After these meetings were over, Hale would come back to the CIT and tell the us which cases were deemed the highest priority by the top executives. Each and every time, **for months**, it was always "Jerry Sahnan." The pressure rolled down-hill. We were trying to find dirt on Sahnan, but he was clean.

146. However, every single time Hale came back from these meetings with COO Rebelez, he would be irritated at my team for not finding anything on Sahnan. He stated time and time again that Sahnan was deemed the highest priority investigation in the company, and we needed to move it forward.

147. We checked for fraud, we examined payroll, we ran background checks on every one of Sahnan's employees, but we found nothing suspicious after the date that he came forward. We did discover that there were a lot of people on video that were not on 7-Eleven payroll prior to Sahnan's admission, but he had corrected it.

148. **Hale told us on numerous occasions** that Sahnan was the president of the FOA (Franchise Owners Association) in Arizona, and ultimately a menace to Rebelez, Joe DePinto, and the other executives, and that this was the motive for our persistence in taking Sahnan out, and there were many witnesses to Hale saying this.

149. Thousands of man hours were wasted by investigating Sahnan. All of these other credible immigration and payroll tips were coming in, and the CIT's most talented investigator, Mike Aldridge, was spinning his wheels on a case with zero evidence.

150. I had many conversations with Aldridge about his exasperation of working a case where no evidence existed.

151. We were finally told by Mark Stinde himself that the guys in the executive offices, CEO DePinto, COO Rebelez, etc wanted Sahnan gone because he was a "pain in their ass".

152. The search for "dirt" and an excuse to terminate Jerry Sahnan is an illustration of the fact that the 7-Eleven Asset Protection Department is a business with a primary focus on facilitating personal vendettas from top management, taking back stores and reselling them for profit.

18

**7-Eleven's False Accusations Against Karamajeet Sodhi**

153. In a Temporary Restraining Order hearing against 7-Eleven, on 07-03-2013, an argument was made that the case against Karamajeet Sodhi was "retaliatory in nature" and that 7-Eleven's entire case brought against Sodhi was due to Sodhi's position as president of the New Jersey FOA (Franchise Owner's Association), and the fact that Sodhi had expressed some concerns regarding the actions of 7-Eleven.

154. "Sodhi" was a name we heard almost daily after Tariq Khan (TK). However, before the trial of TK, I had only heard Sodhi's name a couple of times

155. I was told by Art Lazo, the current Director of Investigations and SSC Operations at 7-Eleven, that Sodhi was "Public Enemy #2" after Tariq Khan. He made this comment when he was still a contractor with Asset Protection Associates (APA).

156. Sodhi was the case that was on deck after the successful removal of Tariq Khan. The Tariq Khan investigation was Lazo's baby. He worked it from beginning to end, and it was the model for which the CIT was to operate.

157. After the TK trial was complete, we started hearing Sodhi's name more and more frequently. Then, after Mike Aldridge took over the case from Lazo, he was told to investigate Sodhi for fraud and payroll.

158. No fraud was ever found.

159. So, Mike came to me on many occasions comparing Sodhi to Sahnan.

160. So, he and I had many talks about the Sodhi case being unwinnable. I do not have any knowledge of the Sodhi case having been halted by the government. If this actually occurred, it was not communicated to the investigators that were supposed to receive ALL info about the case in order to build a proper case analysis.

161. Cases like Sodhi and Jerry Sahnan, are THE reason I left 7-Eleven.

162. I could not be a weapon of vengeance for 7-Eleven executives. I did not sleep well at night after managing a case load that only had an agenda for silencing well respected franchisees who were rebelling against injustices they were enduring.

163.   In my previous positions with major corporations, I helped design and implement programs that helped prosecute thieves for which evidence existed beyond reasonable doubt.

164.   Working for 7-Eleven, I felt that I, and **most importantly,** I felt like the honest and hardworking individuals I recruited to the CIT (like Mike Aldridge) were using our expertise for unethical and even unlawful missions.

165.   What I witnessed at 7-Eleven were not the actions of a legitimate Asset Protection/Loss Prevention program, and I feel it is my duty to expose the injustices that I witnessed.

I CERTIFY that the above is true to the best of my knowledge and I am aware of the penalties for making false statements.


Dated April 29th, 2014


KURT MCCORD                          _____


20

**Exhibit A**
**Page 20 of 25**

# EXHIBIT A

# KURT McCORD, CFI

## Loss Prevention Executive

*Expert in the detection and resolution of theft and fraud, minimizing shrink, and maximizing a safe and secure environment. Outstanding leader with a knack for building law enforcement partnerships. Seasoned interrogator with a certification as a forensic interviewer.*

## *Professional Experience:*

### 7-Eleven                                          May 2013-February 2014

#### Corporate Investigations Supervisor                                   Dallas, Texas

Responsible for high priority, multi-million dollar fraud investigations against 7-Eleven franchisees. Responsible for the leadership and productivity of 4 salaried Corporate Investigators. Charged with analyzing investigators' findings and making strategy recommendations to the Investigations Director and Vice President of Asset Protection. Prepare high priority fraud investigations for trial, and travel for trial to assist legal counsel.

- Provided key direction, research, case prep, and strategy for closing out the highest profile case in 2013. 7-Eleven Inc. v. Tariq Khan (2013).
- Recruited and creating training for the new Corporate Investigations Team.

### Burlington Coat Factory                           January 2012-May 2013

#### Loss Prevention Supervisor                                            Plano, Texas

Responsible for internal theft investigations, Organized Retail Crimes investigations, and shrink initiatives in 6 Burlington Coat Factory stores in the Dallas/Fort Worth area. In charge of supervising and training 13 direct reports. Responsible for meeting payroll budgeting goals, with a focus on return on investment. In charge of physical security and security incident response, as well as driving safety focuses. Charged with developing and maintaining strong partnerships with law enforcement. In charge of Shortage Control Audits for assigned stores, with frequency based on risk indicators.

- #1 Region in the Territory in total dollar shrink reduction for 2012, with $1.2 million in reduction.
- The 6 out of 18 stores charged with represented $690,000, or %57.75 of the reduction.
- #1 RLPS in the Territory in external apprehensions for 2012.
- #1 RLPS in the Territory for internal investigations resolution for 2012.

### Target Corporation                         December 2007-September 2011

#### Executive Team Leader – Assets Protection                          Fort Worth, Texas

Promoted to this position in 2008. Responsible for all internal and external theft investigations in a high risk / 65 million dollar store.  In charge of training new executives and executives not meeting performance standards on internal and external theft routines. Managed a team of 8 direct reports. In charge of physical security and security incident response. Developed and maintained strong partnerships with law enforcement.

- Ranked #3 out of 500 stores in the region in closed internal investigations for 2011.
- Ranked #1 out of 79 stores in the group for closed internal investigations for 2010, with 28 productive interviews.
- Ranked #2 out of 79 stores in the group for external apprehensions in 2010 with 160.
- Awarded the designation of Assets Protection District Resource. The APDR is store leadership's first point of contact for all Loss Prevention related questions.
- Reduced inventory score from 1.39 to .89 in 2 years, saving $208,000.
- Developed 7 direct reports who were promoted.
- Received a Letter of Commendation from the Lake Worth Police Department for outstanding efforts in combatting Organized Retail Crime.

- Instrumental in the development of a Retail Theft Task Force by the Lake Worth Police Department. This created 2 full time officers designated primarily for responding to and preventing theft in the retail sector.
- Received score of "Excellent" on every annual review.

## ORC Investigations Technician                                                                 Dallas, Texas

Initiated and investigated complex Organized Retail Crime and internal theft investigations. Developed and maintained strong partnerships with law enforcement at local, state, and federal levels to work and prosecute cases. Acted as the law enforcement liaison of the Investigations Center, which entailed handling all law enforcement requests for video and electronic journal evidence. In charge of running all exception report data for 43 stores, initiating investigations as needed. Trained Investigations Technicians, store side executives, and upper level leadership on Target Video Solutions, which is now the company's standard surveillance software.

- Named District 306's Assets Protection Partner of the Quarter.
- Worked closely with the Secret Service to close a counterfeit currency ring which netted over 20 arrests and held a total case value of $250,000.
- Discovered a coupon glitch that saved the company $90,000.
- Initiated 47 internal investigations via exception report data.
- The only Investigations Technician elected to go the Group Talent Day for high potential Assets Protection team members.
- Promoted to Executive Team Leader-Assets Protection in 5 months.

## Education

### Texas Tech University                                                                      Lubbock, Texas

- Bachelor of Arts, English
- Minor in Communications

## Certifications

### Certified Forensic Interviewer (CFI)
### International Association of Interviewers (IAI)

# EXHIBIT B

 News Brief _____ *News Brief sponsored by:*  

**7-Eleven adds 35 Asset Protection positions - the biggest Asset Protection roll-out of 2013** The evolution of the Asset Protection program at 7-Eleven has taken off since Mark Stinde, VP AP joined the organization a couple of years ago. Driven by analytics, they have been able to show a significant return on their investment to the point where it's justified adding 35 Asset Protection positions this year. This is the leading retailer of the year for Asset protection growth.

# Exhibit B

# <u>Certification of Brett A. Boyle, Ph.D.</u>

I, **Brett A. Boyle**, Ph.D., of full legal age, hereby certify as follows:

1.      I am a tenured Associate Professor of Marketing at Saint Louis University and have been on the where faculty since 1997.

2.      I have taught the Distribution Channels course on both the undergraduate and graduate level; and have served as the Associate Director of the Center for Supply Chain Management at Saint Louis University.

3.      I have been published and have presented numerous research studies focused on distribution channel relationships.

4.      My research has appeared in significant publications within the marketing field, including the *Journal of Marketing Research*, the *Journal of Business Ethics,* the *Journal of Marketing Channels,* and the *Journal of Business Research*.

5.      I make this certification in support of the issue of unfair and abusive franchise practices of Defendant 7-Eleven, Inc. raised by Plaintiff FOAGLA.

6.      It is my professional opinion based upon facts and evidence I have reviewed that Defendant 7-Eleven, Inc. has engaged in a systemic practice of "churning" franchises with the intention of maximizing revenues by reselling the franchises to third parties.

1

7.     Further, Defendant 7-Eleven has targeted specific ethnic groups – primarily Indian and Southeast Asians – for the purposes of exploiting cultural vulnerabilities associated with these groups (See Role of Culture section below) as occurred in the case involving Riverside California franchisee *Dilip Patel where* Defendant 7-Eleven engaged in extremely coercive and intimidating tactics to take full advantage of these vulnerabilities.

8.     Business research has uncovered various dimensions by which cultures differ from one another.

9.     One such dimension particularly germane to this case is known as "power distance," defined as "the extent to which the less powerful members of institutions and organizations … expect and accept that power is distributed unequally" (Hofestede *et al.*, 2010, p.61).

10.    In high power-distance cultures, power tends to be centralized in both government and private organizational systems.

11.    Workers accept – and even *favor* – autocratic supervision and direction, taking pride in the success of *their superior*, rather than that of themselves.

12.    In general, high power-distance cultures accept that superiors and subordinates are by nature unequal to one another.

2

13.     Based upon a series of studies by Hofstede and his colleagues[1], the following countries rated high on their Power Distance Index (PDI): Malaysia, the Philippines, Bangladesh, China/Hong Kong, Indonesia, India, Singapore, Vietnam, and Thailand.

14.     A second dimension of cultures with relevance to this case is that of Collectivism.

15.     In countries high in collectivism, *the group* is the primary unit for the individual's life.

16.     Opinions, aspirations, norms of behavior, and priorities are a product of the group, rather than determined by any one individual.

17.     Personal achievements are discouraged in collectivist societies in favor of success of the group as a whole.

18.     For many cultures high in collectivism, the most salient and significant group influence is that of the family.

19.     As is the case with 7-Eleven franchisees, franchise ownership tends to be centered within families, particularly those of Indian and Southeast Asian ethnic groups. What's more, these families have strong ties to their ethnic communities in their geographic area.

---

[1] Hofstede, Geert; Hofstede, Gert J.; and Minkov, Michael (2010). *Culture and Organizations: Software of     the Mind.* New York: McGraw-Hill.

3

20.   *The same countries listed previously as rating high on power-distance* <u>*also*</u> *rate high on collectivism.*

21.   According to applicable research Southeast Asian cultures score high on these two dimensions (the U.S. rates extremely low on both).

22.   Therefore, ethnic groups from these cultures are particularly vulnerable to exploitation.

23.   Because of their deference to authority (i.e., high power distance), even a franchisor's false accusations of impropriety by the franchisee many times will go unchallenged.

24.   The individual from such cultures will be prone to acquiesce to coercion by the franchisor, given the disproportionate power advantage the franchisor holds.

25.   Further, making public any claims of franchisee impropriety (however false) comes with a great deal of shame to the family within tightly-knit ethnic communities.

26.   The threat of such shame acts as motivation to give in to the threats by the franchisor.

27.   It is my opinion that 7-Eleven well understands the cultural collectivism and "power distances" dynamic to unfairly exploit its franchise relationship with its Indian and Southeast Asian franchisees.

4

I hereby certify that the above is true and accurate to the best of my knowledge.

Brett Boyle, Ph.D.

Dated: June 27, 2014

5

# Exhibit C

## Certification of Jaideep Singh, Ph.D.

Jaideep Singh, Ph.D., of full legal age, hereby certify as follows:

1.      I hold a Ph.D. in Comparative Ethnic Studies from UC Berkeley, with a specialization in the South Asian American diaspora.

2.      I occupied the Sabharwal Endowed Chair in Sikh and Punjabi Studies at CSU East Bay from 2009-2012.

3.      I am also the co-founder of the Sikh American Legal Defense and Education Fund.

4.      I make this Certification in support of the issue of unfair and abusive franchise practices raised by Plaintiff FOAGLA and its discriminatory effect upon South Asian franchisees.

5.      I make that determination based upon my own education, experience and credentials to analyze cross-cultural and inter-racial relations in business and society.  I also rely upon my analysis of materials I reviewed in the *Dilip and Saroj Patel* case (including telephone conversations I had with the Patels), the matter of *7-Eleven v. Karamjeet Sodhi* that is venued in the District Court of New Jersey, and other materials I have reviewed.

6.      All of these materials in the aggregate support my determination that 7-Eleven's is aware of and exploits the social vulnerability of South Asian American immigrants, which includes migrants emanating from India, Pakistan, Nepal, Sri Lanka, Bangladesh, Bhutan and the Maldives. The religious affiliations of these individuals, a primary determinant of personal identity for many if not most, include Hinduism, Islam and the Sikh faith.

7.      South Asian immigrants are members of religious and racial minority communities, in which community social pressures and stigma reinforce expected and culturally appropriate behavior.

1

Exhibit C
Page 1 of 4

8.     The social context for many, if not most, South Asian Americans is significantly influenced by membership in a discrete local ethno-religious community, in which everyone knows everyone else, and often the intimate details of their personal business. In this cultural context gossip, community-level shaming, and social exclusion are all ways to inflict a "social death" upon shunned community members. This ostracism is particularly powerful because of the significant value placed by many if not most South Asian Americans on membership and participation in one's ethno-religious community.

9.     As consequence of intimidation and threats of incarceration and public censure issued by 7-Eleven investigators and fearing ostracism from their close-knit ethno-religious community, the Patels relinquished their valuable business franchise to avoid tarnishing a reputation they had built up over many years among their compatriots.

10.     Exhibiting a tenor of discord from the very beginning, 7-Eleven's loss prevention managers began the meeting they requested with the Patels with a hostile threat of demanding the Patels pay $100,000 or else 7-Eleven would file a federal lawsuit against them, individually and/or collectively, for $250,000.

11.     The threats and actions of the 7-Eleven investigators became far worse during the protracted eight-hour interrogation ordeal to which they subjected the Patels, elderly immigrant grandparents.

12.     7-Eleven's interrogators charged the Patels with committing Slupee coupon fraud when 7-Eleven managers had, in the past, encouraged the Patels to liberally coupon and give away free merchandise to children in the nearby elementary school children for getting good grades.

13.     7-Eleven's Asset Protection Interrogators repeatedly bullied the elderly immigrant couple, saying they would immediately file suit if they left the building.

2

Exhibit C
Page 2 of 4

14.     The interrogators then resorted to the exploitation of the Patels' cultural vulnerabilities as members of a tightly-knit immigrant community, in which personal reputation and honor play a paramount role in social status.

15.     7-Eleven's interrogators threatened to publicly embarrass them and undermine the honorable reputation the Patels has spent decades building up.

16.     This threat is particularly powerful when leveled against South Asian American immigrants, because of the possibility of social ostracism from one's beloved and sustaining ethno-religious/linguistic community. Within this ethnic community setting is the lone site these migrants can practice their culture and speak their beloved mother tongue, carrying with it feelings and remembrances of home, youth, identity, and family.

17.     Exclusion from the community is a particularly efficacious form of intimidation because of the essential role ethnic communities' play in the lives of most South Asian Americans.

18.     His position in his community and family were clearly paramount on Mr. Patel's mind when he made the decision to sign away his family's livelihood. As he explained to me in our conversation, he worried: "How am I going to face my friends and family and tell them what happened to me?" He told me that as the oldest child in his family, he worried that he would no longer be respected enough to fulfill his culturally-dictated position within the family as a role model, big brother, and advisor.

19.     Perhaps most egregiously, the interrogators lied about the possibility of imprisonment for the elderly immigrant couple for tax evasion.

20.     7-Eleven investigator Kellison told Patels that if 7-Eleven filed the threatened civil action in federal court, the Internal Revenue Service ("IRS") would likely hear about it, and that the Patels could face imprisonment. In furtherance of these tactics, Mr. New told that Patels that his mother

3

Exhibit C
Page 3 of 4

formerly worked for the IRS and that the threatened lawsuit, and those like it, have "a way of getting out" to the IRS.

22. In order to end the eight-hour ordeal, save his wife from a possible diabetic episode, and avoid the threatened litigation, community humiliation, and possible imprisonment which would prevent his establishing a relationship with his new grandson, Dilip Patel capitulated and agreed to terminate his franchise.

22. These facts, in the aggregate, and which to date have not been contradicted by 7-Eleven, support my conclusion that the tactics used in the Patel, and Sodhi cases and are part of a wider, national 7-Eleven scheme to improperly discriminate against and exploit the social vulnerability of South Asian American immigrants owning franchiese.

I hereby certify that all of the foregoing is true and accurate to the best of my knowledge.

_____
Jaideep Singh, Ph.D

Date: June 30, 2014

4

Exhibit C
Page 4 of 4

# Exhibit D

**From:** GM-action_requested-nr
**Sent:** 05/23/2014 04:01:47 PM
**To:** [Select US Stores]
**Cc:**
**Subject:** Action Requested: Security System and Monitoring Amendment (1 Attachment)

---

## A C T I O N   R E Q U E S T E D

*Sent on behalf of Asset Protection*

| To: | US Franchisee who signed the 1/04 & 8/08 Security System & Monitoring Amendment |
|---|---|
| CC: | |
| From: | Asset Protection |
| RE: | Action Requested: Security System and Monitoring Amendment (1 Attachment) |

Dear Franchisee:

We notified you on February 21, 2014, that the Security System and Monitoring Amendment (form 4401000, dated 1/04) had terminated, and impacted franchisees would be required to sign a new amendment. We want to make you aware that there was also an 8/08 dated version of the document (with the same form number) that has also been terminated, and such 8/08 version should have been included in the notice previously sent to you.

We are sending this notice to you because our records indicate that you signed a 1/04 or 8/08 version of the Security System and Monitoring Amendment. Attached is a copy of the new amendment you are required to sign. **Please review the amendment at your earliest convenience, sign the form and return the signature page to us. Using the backroom ISP's Printer/Scanner, please scan the signature page only to Button 3 "Merch Action Needed" by June 30, 2014.**

We appreciate your cooperation in this matter.

Thank you.

Asset Protection

==== *Sent from an automated email system. Do not reply.* ====

## SECURITY SYSTEM AND MONITORING AMENDMENT

7-Eleven, Inc. ("SEI") has contracted with Tyco Integrated Security LLC ("Tyco") to provide electronic security equipment (the "Equipment") to your franchised 7-Eleven Store No._____ (the "Store"). Such equipment is "7-Eleven Equipment" under the terms of your franchise agreement (the "Franchise Agreement"). This "Security System and Monitoring Amendment" ("Amendment") to your Franchise Agreement sets forth terms and conditions with respect to the Equipment.

### TERMS AND CONDITIONS

1.    <u>Term of Amendment</u>.  The term of this Amendment will begin on the termination date of the previously existing Security System and Monitoring Amendment covering the Store which this Amendment is replacing, and will terminate on the earlier of: (i) the date the agreement between SEI and Tyco terminates; or (ii) the termination of the Franchise Agreement. This Amendment may be renewed or extended in our sole discretion. If this Amendment terminates for any reason, you understand that you will have to sign a new Amendment regarding electronic security equipment.

2.    <u>Monitoring Charges</u>.  You agree to pay a monthly "Monitoring Service Charge" of $10.00.  SEI will charge the amount to your Open Account in accordance with the terms of the Agreement.  The Monitoring Service Charge amount may change from time to time.

3.    <u>Maintenance Charges</u>.  You agree to pay the current monthly "Maintenance Charge" based on the CCTV system in your store.  Stores with ClickIt DVRs agree to pay $25.00 monthly.  Stores with Digiop DVRs agree to pay $35.00 monthly. SEI will charge the amount to your Open Account in accordance with the terms of the Agreement. The Maintenance Charge amount may change from time to time.

4.    <u>Franchisee Obligations</u>.  You agree to:

(a)    promptly notify SEI upon detecting any defects in the Equipment.

(b)    not damage, interfere with, or impair in any way the operation of the Equipment.

(c)    cooperate fully with SEI to obtain any consents or waivers from all persons or entities having an interest in the Store to install, maintain and operate the Equipment.

(d)    not remove, disable or disconnect the Equipment or any of its functions in any way without SEI's prior written approval.

(e)    allow SEI or Tyco (or Tyco's designee) to install the Equipment in your Store at a location designated by SEI and allow any changes in merchandise or equipment layout necessary to install the Equipment and allow access to the Equipment for its maintenance and operation.

(f)    provide SEI access to the Equipment at any time and for any period of time, consistent with and in accordance with your obligations with respect to all 7-Eleven Equipment under the Agreement.

(g)    cooperate with SEI and with any law enforcement authorities or investigators regarding any robbery or other criminal incident, or potential robbery or other criminal incident.

5.    <u>Governmental Fines or Penalties</u>.  You agree that any governmental fine or penalty imposed upon the Store due to false alarms in connection with the Equipment, or misuse of the System, will be your sole responsibility.

You and SEI have signed this Amendment effective as of _____.


**FRANCHISEE**

Store No._____


_____
Corporation Name (If Applicable)


By _____        By _____

_____        _____
           (Written Name)                            (Written Name)

Date _____        Date _____


By _____        By _____

_____        _____
           (Written Name)                            (Written Name)

Date _____        Date _____


**7-ELEVEN, INC.**

By _____

_____
           (Written Name)

Date _____

# Exhibit E

Certification of ___John Ragsdale___

I was a 7-Eleven Loss Prevention investigator, now called Asset

Protection, from _10-1993_ to _1-2006_ .

I am familiar with the video recording system installed in 7-

Eleven stores.  The original intent of the video recording system was to

deter robbery, customer theft, assault and other violent crime in the

store.  The system was not intended to be used for 24 hour surveillance

of franchisee actions and activities.

I certify that the above information is true.

Dated: June 24, 2014

Certification of _KEVIN  ELIASON_

I was a 7-Eleven Loss Prevention investigator, now called Asset

Protection, from _1981_ to _2000_ .

I am familiar with the video recording system installed in 7-

Eleven stores.  The original intent of the video recording system was to

deter robbery, customer theft, assault and other violent crime in the

store.  The system was not intended to be used for 24 hour surveillance

of franchisee actions and activities.

I certify that the above information is true.

_____

Dated: June 27, 2014

Certification of _Arthur W. Salcido_

I was a 7-Eleven asset protection investigator from _05/1978_ to _11/1987_

I am familiar with the video recording system installed in 7-Eleven stores.

The original intent of the video recording system was to deter robbery, customer theft assault and other violent crime in the store.

The system was not intended to be used for 24 hour surveillance of franchisee actions and activities.

I certify that the above information is true.

_Arthur W. Salcido_

Dated: June _29_, 2014

# Exhibit F

**Filed Under Seal**

# Exhibit G

# Guest Experience Assessment

| | |
|---|---|
| First Name | |
| Last Name | Daniel |
| Store | Barajas |
| Position | PG |
| Type | Regular |
| Date/Time | 5/22/14 11:20 |

**Rating: Select one of these from each drop down menu**

| | | |
|---|---|---|
| E | Excellent Execution | Demonstrates all standards at a high level |
| M | Meets Standards | Demonstrates all standards, some at high level |
| B | Below Standards | Demonstrates most standards or some at poor/neglected state |
| U | Unacceptable | Fails to demonstrate most standards or some or all standards at a poor/neglected state. |
| N/A | Not Applicable | This item could not be assessed. Response not available on all questions. |

Rate each assessment item using the standards above by selecting the proper letter code with a 3 for Excellent Execution, 2 for Meets Standards, 1 for below standard and 0 for Unacceptable. (Note "N/A" is not available for all items.)

The column to the right of the question number indicates that question's weighting. E.g., a question weighted 2, has 2 times the points available as a 1 and in this example meets standard would earn 4 points (2 times 2) of a possible 6.

| Line # | WT | Please Rate: | | Comments |
|---|---|---|---|---|
| **Guest Focus** | | | | |
| 1 | 2 | Associates demonstrate pride in 7-Eleven brand by their appearance | M | |
| 2 | 4 | Associates fostering of guest loyalty | M | |
| 3 | 2 | Associates ability to communicate | M | |
| 4 | 4 | Associates urgency to guest service | M | |
| 5 | 1 | Associates plus-selling effectiveness | E | |
| 6 | 1 | Associates develop trust in food with guests | M | |
| **Store View** | | | | |
| 7 | 1 | Store premises | M | |
| 8 | 1 | Fueling experience | M | |
| 9 | 1 | Car wash | N/A | |
| 10 | 1 | Store front appearance | M | |
| 11 | 1 | Safe shopping experience | M | |
| 12 | 1 | Store environment | B | dust accumulated on ceiling above food service, other vents starting to accumulate dust |
| 13 | 1 | Sales floor merchandising | M | |
| 14 | 1 | Sales counter readiness | M | |
| 15 | 3 | Shelf Tag deployment | M | |
| 16 | 1 | Vault cleanliness | M | |
| 17 | 2 | Vault product availability | M | |
| 18 | 1 | Ice and frozen merchandising | M | minor dust on bottom front of ice upright freezer |

# Guest Experience Assessment

Rating: Select one of these from each drop down menu

| | | |
|---|---|---|
| E | Excellent Execution | Demonstrates all standards at a high level |
| M | Meets Standards | Demonstrates all standards, some at high level |
| B | Below Standards | Demonstrates most standards, no standards at poor/neglected state |
| U | Unacceptable | Fails to demonstrate most standards or some or all standards at a poor/neglected state. |
| N/A | Not Applicable | This item could not be assessed. Response not available on all questions. |

Rate each assessment item using the standards above by selecting the proper letter code with a 3 for Excellent Execution, 2 for Meets Standards, 1 for below standard and 0 for Unacceptable. (Note "N/A" is not available for all items.)

The column to the right of the question number indicates that question's weighting. E.g., a question weighted 2, has 2 times the points available as a 1 and in this example meets standard would earn 4 points (2 times 2) of a possible 6.

| Line # | WT | Please Rate: | | Comments |
|---|---|---|---|---|
| **Fresh Food & Proprietary Beverages Cleanliness** | | | | |
| 19 | 4 | Rest rooms | M | |
| 20 | 3 | Hot beverage area and equipment cleanliness | M | sweep and mop under coffee bar |
| 21 | 3 | Cold and frozen beverage area and equipment cleanliness | M | mop under coffee brewers |
| 22 | 1 | Fresh Brewed Iced Tea and Fresh Brewed Iced Coffee cleanliness | M | |
| 23 | 1 | Safe Food Handling | M | |
| 24 | 3 | Sandwich/salads/fresh fruit/fast food cleanliness | M | |
| 25 | 3 | Fresh Bakery cleanliness | M | |
| 26 | 3 | Roller Grill cleanliness | M | clean white rings under the grills |
| 27 | 3 | Hot food cleanliness | M | |
| 28 | 3 | Fresh condiment cleanliness | M | wipe door gaskets on door |
| **Fresh Food & Proprietary Beverages Availability** | | | | |
| 29 | 2 | Hot beverage availability | M | |
| 30 | 2 | Cold and frozen beverage availability | M | |
| 31 | 2 | Fresh Brewed Iced Tea and Fresh Brewed Iced Coffee availability | M | |
| 32 | 2 | Sandwich/salads/fresh fruit/fast food availability | M | |
| 33 | 2 | Fresh Bakery availability | M | |
| 34 | 2 | Roller Grill availability | M | |
| 35 | 2 | Hot food availability | E | |
| 36 | 2 | Guests food supplies (Condiments, utensils, napkins, etc.) | M | |

Exhibit G
Page 2 of 5

| First Name | Daniel |
|---|---|
| Last Name | Barajas |
| Store | 35639 |
| Position | FC |
| Type | Regular |
| Date/Time | 5/22/14 11:20 |

## 2014 Guest Experience Product Quality Assessment

**Safe Food Storage** -Products stored off sales floor are at correct temperature, coded and in code
**Display** -Product for sale on sales floor appears fresh, where applicable is coded and in code
**Temperature** -Product for sale is at proper temp

| | For each open block, select "Y" the store complies with the standard, "N" the store is not in compliance, or "N/A" if the product is not available for assessment in the any of the columns. All blocks have a value of 1 point. "N/A"s are not considered in the calculation. | Safe Food Storage | Display | Temperature | Notes |
|---|---|---|---|---|---|
| 1 | Bananas, Whole Fruits & Vegetables | Y | Y | | |
| 2 | Fresh Bakery | Y | Y | | |
| 3 | Multi day bakery | Y | Y | | |
| 4 | Packaged bakery and bread | Y | Y | | |
| 5 | Coffee | Y | Y | Y | |
| 6 | Coffee Condiments | Y | Y | Y | |
| 7 | Slurpee/FSD Bag In Box | Y | | | |
| 8 | Chillers Iced Coffee | N | Y | Y | store in vault |
| 9 | Fresh Brewed Iced Coffee/Iced Tea | Y | Y | | |
| 10 | Sandwiches/Salads/Cut Fruits | Y | Y | Y | |
| 11 | Fast Food | Y | Y | Y | |
| 12 | Dairy/Deli | Y | Y | Y | |
| 13 | Chili/ Cheese | Y | N | Y | chili cheese not coded |
| 14 | Fresh/Bulk Condiments | Y | Y | Y | |
| 15 | Roller Grill Buns | Y | Y | | |
| 16 | Roller Grill | Y | Y | Y | |
| 17 | Hot foods | Y | Y | Y | |
| 18 | Pizza | Y | Y | Y | |
| 19 | Use of recommended items | N | | | |
| 20 | Pest control | Y | | | |

| First Name | Daniel |
|---|---|
| Last Name | Barojas |
| Store | 35639 |
| Position | FC |
| Type | Regular |
| Date/Time | 5/2/14 11:20 |

## 2014 Infrastructure Assessment

| Line # | Weight | All Questions are answered "G", "Y", "R" (or "N/A" as available) | | Notes |
|---|---|---|---|---|
| 1 | 2 | Are current four steps in place that are not single item focused, include action steps and are verified weekly? | G | |
| 2 | 1 | Are the Coffee Server/Pot management tools current and being followed? | Y | |
| 3 | 1 | Are coffee temperatures recorded in the Hot Coffee Temperature Log. | Y | |
| 4 | 1 | Is the roller grill management tool in place and the offering on the roller grill matches the plan? | R | |
| 5 | 1 | Is the hot food management tool in place and the offering matches the plan? | G | |
| 6 | 1 | Is cleaning of iced beverage equipment documented on the Iced Beverages Equipment Cleaning Log? | Y | |
| 7 | 1 | Are job assignments available and being used consistently? | G | |
| 8 | 1 | Is weekly shelf tag maintenance completed? | G | |
| 9 | 2 | Is FMIO being used for all orders? | G | |
| 10 | 2 | Is the weekly merchandise cycle being used to manage deleted items? | G | |
| 11 | 2 | Is shelf sequencing accurate when checking at least one vault and one center of the store area? | Y | |

| | |
|---|---|
| **First Name** | Daniel |
| **Last Name** | Barajas |
| **Store** | 35639 |
| **Position** | FC |
| **Type** | Regular |
| **Date/Time** | 5/22/14 11:20 |

| | |
|---|---|
| Guest Score | 69% |
| Store View | 64% |
| Fresh Food/Proprietary Beverage Cleanliness | 67% |
| Fresh Food/Proprietary Beverage Availability | 71% |
| Product Quality | 94% |
| Infrastructure | 77% |

Total Cleanliness | 66% |

*Total points earned divided by total points available from Store View and FF/PB Cleanliness*

Fresh Food Execution | 75% |

*25% of Guest Score; 25% of Total Cleanliness; 25% of FF/PB Availability; 25% Product Quality*

# Exhibit H

## Certification of Richard Schwarz as to Store Operator Lack of
## Independent Judgment and Decision Making

1.  I am former 7-11 franchisee having operated a store from 1988 to 1996.

2.  After I sold this store I worked as an Independent Consultant with Seven Eleven Incorporated (SEI) as a Franchise Liaison in Southern California region from 1998 to 2002.

3.  I now am an owner/manager of an accounting/bookkeeping company, Ser-Vis-Etc.LLC, that ONLY specializes in 7-Eleven accounting.

4.  Our other owner/manager, Norn Winslow, is a former 7-Eleven employee and between the two of us we have over 60 years of 7-Eleven experience. Before, becoming a 7-Eleven Franchisee, I worked for JC Penney in various store management capacities, the last 10 years supervising management employees including accounting, security and human resource departments.

5.  I make this certification as a consultant on behalf of FOAGLA

6.  It is my experience after years of being involved with the 7-Eleven system that changes have occurred in the relationship between 7-Eleven and its store operators that change them from "independent contractors" to employees.

7.  The change is due to the extreme control 7-Eleven exerts over every aspect of the convenience store business leaving no room for independent action on the part of the store operator.

8.  In my opinion, the store operator is an employee and no longer a "franchisee"

9.  It should be noted that all of the following functions are determined and implemented by 7-Eleven without any input or decisional power by the store operator.

### Equipment and Maintenance

*   7-Eleven supplies building and all the equipment used in the store.
*   7-Eleven maintains control of lease.
*   The Franchise is prevented from normal contact with the landlord.
*   The franchisee is not allowed to negotiate any modifications to the building and/or common area. This includes security fences, common area lights and trash pickup when part of a common area.

- All equipment is owned by 7-Eleven even the office desk.
- Franchisees are not allowed to install or purchase any equipment.
- Franchisees are forced to pay exorbitant monthly maintenance contract charges and repair fees to maintain equipment 50% to 150% past industry normal lifecycle.
- This contract is negotiated by 7-Eleven without input from Franchisees.
- Franchisees are not allowed to see a copy of the maintenance agreement and the details of what is covered.
- Franchises are not allowed to perform any maintenance on 7-Eleven equipment or hire a local person to perform any work.

### Tax Payments, Payroll, Depositing and Licenses

- 7-Eleven completes and submits all Federal and State taxes without Franchisee approval.
- 7-Eleven controls (and frequently rejects) Franchisee expenses paid through the store.
- 7-Eleven controls all government license processes.
- Through a third party provider, at the Franchisee's expense, 7-Eleven applies for and renewal licenses. 7-Eleven puts its name on all licenses that allow it and Franchisees are not allowed input or approval in this process but are liable for errors.
- 7-Eleven Inc. requires that stores use their payroll system. This gives 7-Eleven direct control of all payroll taxes, Federal, State and Local for all store employees.
- Stores are required to deposit to 7-Eleven accounts daily or at assigned times all funds from all activities in the store less documented expenses.
- Service sales are charged to the store's account daily while 7-Eleven Inc. pays the vendor when due. For example, the California Lottery averages a 14 day "float" and only requires that sufficient funds be available when it pulls its charges. It is common for stores to average \$2500/day in gross lottery sales and that must be paid each day despite the "float".

### Accounting

- 7-Eleven does all of the accounting. At the end of the month Franchisees can print the store P&L and see how much money they have made. Much of the information and key reports are not available before the P&L is finalized.
- Yet store P&Ls have a disclaimer on the bottom of the page stating: "all information is provided by franchisee, 7-Eleven does not guarantee the accuracy of these financials".

### Supervision by Multiple Levels of 7-Eleven Manager/Employees

- Franchisees are closely supervised and monitored by:
  - o #1 Field Consultant, FC (An Area Supervisor) is assigned to a store, this individual can drop in the store anytime unannounced on top of a weekly scheduled visits. FCs have full access to every corner of the store.
  - o #2 Market Manager oversees the FC and can visit store anytime
  - o #3 Zone Leader is in charge of both Market Manager and FC and same applies to their visit.
  - o #4 Senior VP of Operations overseas all of the above and same applies to their visit

### Monitoring/Surveillance By 7-Eleven Corporate Investigators

- Asset Protection (AP) (previously called Loss Prevention) has full surveillance control of Franchisee stores.
- Asset Protection has full capability to view the store, employees, customers, vendors and Franchisees.
- Asset Protection can view live or past history for months and have audio capabilities along with video.
- With cameras Asset Protection can pinpoint transactions with a fine comb. Franchisees have no training remote access and/or access to this system yet Franchisees pay a monthly fee for this surveillance.
- The camera/surveillance equipment was paid with "low ball" pricing because 7-Eleven promised the provider monthly maintenance contracts would be paid by the Franchisees.

### Store Data

- Store data, generated by sales and purchases is not electronically available to Franchisees. It is available in printed reports which are only available for a limited time, normally 45 days.
- Corporate managers, both Operations and AP, have and use information that the Franchisee cannot verify or even see the source.
- 7-Eleven sells this data/information for this data, upon information and belief, for millions but Franchisees do not see a penny because 7-Eleven maintains it is "their data"

### Advertising/Marketing Money

- Franchisees pay for advertising yet never get a report as to where the money is being spent.
- 7-Eleven also gets marketing money from suppliers and Franchisees no clue where this money is spent.

### Remote Physical Control of the Store by 7-Eleven Corporate in Dallas

- 7-Eleven controls the store interior temperatures.
- On new stores the outside lights are controlled by 7-Eleven remotely.
- Volume and the contents on installed flat screen TVs are controlled by 7-Eleven.

### Audit Control

- Audits on store Inventory is a company hired by SEI without any Franchisee input or control.
- If the audit is short then Franchises are charged the shortage amount but any overage is kept by 7-Eleven.

**Operational Rules and Procedures**

- All instructions, communications and operational rules are addressed to and applied equally to Franchise and Corporate stores.
- Franchisees are given the same instructions as are corporate employee store managers
- The same checklists and details are used in corporate stores and Franchised stores.
- Ordering must be done through 7-Eleven supplied hardware/software in the assigned part of the store for that category.
  - o This requires an employee to count product even when they are looking at a six month's supply
  - o Ordering windows are established arbitrarily without store input requiring scheduling help to order rather than to meet customer counts
  - o Stores are required to have 6 employees trained in ordering for each store. Multiple-store owners cannot get credit in all stores for one person going to all their stores.
  - o Training is several hours, requiring reading and writing skills in English. This limits hiring local individuals in some predominately ethnic areas.
  - o The process is check by 7-Eleven at least monthly to verify that correct procedures were used regardless of the results in the store. A Franchisee can be 100% in business, outperform the area's sales and fail an inspection for not filling in an unneeded box on an electronic order.

**Required Store Training**

- Computer Based Training is on the store ISP. Subjects range from ordering, using the register, Age Restricted Products to equipment care.
  - o Required for Franchisees and Store employees
  - o Required even if the Franchisee would rather use another method that has proven more effective
  - o Required even if the Franchisee has established policies in place that contradict and/or exceed the training. This is a particular issue with Age Restricted product training
  - o Must be repeated periodically
  - o Store compliance electronically monitored by 7-Eleven
  - o Store compliance reviewed monthly

Page 4 of 6

**"Infrastructure" Tools**

- o Eleven work management tools are to be completed and used regardless of their need in a given store. These are all time consuming and can be useless on both high volume and low volume situations. High coffee volume stores, exceeding their brewing/holding capacity do not need to complete a Coffee Server Management tool.
- o Job Assignment Sheets are a tool for communication between the manager and the employee. 7-Eleven Inc. dictates the format and structure of how the Franchisee directs/communicates with his employees.
- o 4-step processes are created by 7-Eleven management and the Franchisee is required to follow them. These can be detailed assignments in specific areas of store operations. Once set, they are reviewed weekly.
- o In each case the process is judged, not the sales/profit results

**Control Over Store Employees by FC Managers**

- o FCs give direct orders to Franchise employees as if the employees work for them.
- o For good store employee work employees are recognized at the 7-Eleven quarterly meetings.
- o The FC will command Franchisee employees with various tasks like getting the stores clean, how to merchandise products, how much to sell these products for, when they should order and how much they should order.

**Ordering of Goods and Minimum "Approved Vendor" Purchases**

- o Franchisees do have control over ordering times, delivery times and product assortments from their recommended suppliers.
- o 7-Eleven tells Franchisees which items to carry, how and where to merchandise them and the suggested quantity.
- o Franchisees are not privy to the true cost of any item.
- o Franchisees are not allowed to see the agreements between suppliers and 7-Eleven that been signed on their behalf.
- o If Franchisees do not purchase the minimum of 85% from 7-Eleven approved vendors, they are penalized for 2% of the total gross profit generated by the store.
- o New Items are ordered by 7-Eleven for the store even when they are not required items or in some cases even related to existing categories.
- o Food items are required even when they fail to sell. A store can sell one of four pastries everyday but be forced to keep buying it.
- o These micro merchandising decisions are made for the store without consulting the Franchisee.
- o Franchisees are required to carry Market Top 10 items even when the store is a demographic extreme for the market.

**Merchandise / Promotions Requirements**
- o Franchisees pay for advertising yet never get a report as to where the money is being spent.
- o 7-Eleven also gets marketing money from suppliers but Franchisees have no clue where this money is spent.

**Evaluation System**
- o Weekly 7-Eleven visits include evaluations that use standardized checklist for compliance to all details of the operation.
- o Results, including pictures, are electronically entered in a database.
- o These evaluations/inspections do not use store or category financial results they focus on retail trivia.

I hereby certify that all of the foregoing is true and accurate to the best of my knowledge.

*Richard R Schwarz*

Richard R. Schwarz

Date: July 1, 2014

Page 6 of 6